**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**David W. LANIER, Defendant–Appellant.**

**No. 93–5608.**

United States Court of Appeals,
Sixth Circuit.

Argued Aug. 9, 1994.

Decided Aug. 31, 1994.

644

Jessica D. Silver, Thomas E. Chandler (argued and briefed), U.S. Dept. of Justice, Civ. Rights Div., Appellate Section, Washington, DC, for plaintiff-appellee.

Wayne Emmons (argued and briefed), Memphis, TN, for defendant-appellant.

David W. Lanier, pro se.

Before: KEITH and MILBURN, Circuit Judges; and WELLFORD, Senior Circuit Judge.

MILBURN, Circuit Judge, delivered the opinion of the court, in which KEITH, Circuit Judge, joined. WELLFORD, Senior Circuit Judge (p. 666), delivered a separate concurring opinion.

MILBURN, Circuit Judge.

Defendant David W. Lanier appeals his jury convictions, and the sentences imposed thereon, of seven counts of the willful deprivation under color of law of the civil rights of various female individuals in violation of 18 U.S.C. § 242. On appeal, the issues are (1) whether the government proved the essential elements of 18 U.S.C. § 242 beyond a reasonable doubt; (2) whether the district court abused its discretion in refusing to sever the trials of the charges against defendant; (3) whether the district court erred in refusing to dismiss the indictment on the ground that it failed to give notice to the defendant of the charges he was required to defend; (4) whether the district court erred in refusing to dismiss the indictment on the ground that the statute, 18 U.S.C. § 242, was impermissibly vague; (5) whether the district court erred in excluding evidence concerning the prior sexual activity and prior drug use of one of the witnesses, Vivian Archie; (6) whether the district court abused its discretion in refusing to grant a one-day continuance of the trial because a local newspaper containing a story about the case was found in the jury room prior to the commencement of the trial; (7) whether the district court erred in failing to grant a mistrial based upon the prosecutor's opening statement; (8) whether the prosecutor committed prosecutorial misconduct in his closing argument by improperly vouching for prosecution witnesses, making inflammatory statements, and calling the defendant names; (9) whether the

defendant was denied a fair trial by prosecutorial misconduct throughout the trial process; (10) whether the jury instructions were improper and prejudicial; (11) whether the district court erred in enhancing defendant's sentence for obstruction of justice under United States Sentencing Guideline ("U.S.S.G.") § 3C1.1; (12) whether the district court erred in imposing a fine and costs of incarceration; (13) whether the district court erred in determining defendant's base offense level; (14) whether the sentence imposed by the district court was disproportionate to the offenses under the Eighth Amendment; and (15) whether the district court erred in refusing to depart downward from the applicable sentencing guidelines under U.S.S.G. § 5K2.0. For the reasons that follow, we affirm.

## I.

On May 20, 1992, a federal grand jury indicted defendant on 11 counts of violating 18 U.S.C. § 242. At the time of the indictment, defendant was the elected chancery court judge for Dyer and Lake Counties in Tennessee, where he also served as juvenile court judge. As the only chancellor and juvenile court judge in said counties, all of the employees of each of the courts, including secretaries, clerks, and juvenile officers, worked at the pleasure of defendant Lanier.

The indictment alleged that between 1988 and 1991, defendant sexually assaulted eight women who either worked for him at the state chancery court, worked for or with him in the juvenile court of Dyer County, or had a case pending before defendant. Count 1 of the indictment alleged that in July 1988, defendant, acting under color of state law, sexually assaulted Patricia Wallace,[1] an employee of the Circuit Court of Dyer County, depriving her of her liberty without due process; namely, the right to be free of sexual assault. The indictment alleged that defendant willfully touched Wallace on and near her crotch and otherwise molested her.

1. In view of all the publicity surrounding the trial of this matter from the various media and the fact that the record was not filed under seal, we have used the victims' names herein. We would not have done this had the circumstances been otherwise.

Counts 2 and 3 of the indictment similarly alleged that during the period from May to August 1989, defendant sexually assaulted Sandra Sanders, an employee of the Dyer County Juvenile Court. The indictment alleged that defendant willfully grabbed Sanders' breasts and buttocks and otherwise molested her.

Counts 4 and 5 of the indictment similarly alleged that in either September or October 1990, defendant sexually assaulted Patty Mahoney, an employee of the Chancery Court of Dyer County. The indictment alleged that defendant willfully grabbed Mahoney's breasts and buttocks, touched his pelvis to her body, and otherwise molested her.

Counts 6 and 7 of the indictment likewise alleged that in September 1990 (Count 6) and again in October 1990 (Count 7) defendant sexually assaulted Vivian Archie by willfully coercing her to engage in sexual acts with defendant Lanier, which resulted in bodily injury to her. Count 8 of the indictment also similarly alleged that during the period from February through May 1991, defendant sexually assaulted Sandy Attaway, an employee of the Chancery Court of Dyer County, by willfully touching his pelvis to her buttocks and otherwise molesting her.

Similarly, count 9 of the indictment alleged that in either February or March 1991, defendant sexually assaulted Ruby Sipes by willfully exposing his genitals to her and urging her to engage in sexual acts with him. Count 10 of the indictment similarly alleged that in April 1991, defendant sexually assaulted Lisa Couch by willfully coercing her to engage in sexual acts with him, resulting in bodily injury to her. Finally, count 11 of the indictment similarly alleged that in September 1991, defendant assaulted Fonda Bandy by willfully grabbing her breasts and crotch, and otherwise molesting her.

Defendant's trial began on November 30, and concluded on December 16, 1992. The evidence presented at trial showed that defendant was born in Dyer County, Tennessee, and had lived there virtually all his life. Defendant is from a politically prominent family. He served as alderman and mayor of Dyersburg, Tennessee, before first being elected Chancery Court Judge of the Twen-ty–Ninth Judicial District in 1982. Defendant was reelected in 1990. He continued to serve as a chancery court judge until he was removed from his position pending resolution of this case.

As a chancery court judge, defendant principally presided over divorces, probate matters, and boundary disputes. Although the circuit court also has concurrent jurisdiction along with chancery court over divorce cases, defendant presided over 80 to 90 percent of the divorce cases in Lake and Dyer Counties, including child support and other matters related to the divorce cases. Further, as earlier stated, defendant also served as juvenile court judge in said counties.

In 1989, defendant hired Sandy Sanders to be the Youth Service Officer of the Dyer County Juvenile Court. Sanders was to supervise the Youth Service Office. During her job interview, defendant told Sanders that he had sole hiring authority for the Youth Service Officer position. Defendant also had the authority to fire the Youth Service Officer.

As part of her job duties, Sanders was required to have weekly meetings with defendant to review the work performed by her office. During one of these weekly meetings, which occurred in defendant's chambers, defendant got up from his desk, sat beside Sanders in a chair, and, during their conversation, grabbed and squeezed her breast. Sanders became upset and tried to remove defendant's hand; however, defendant told her not to be afraid.

Sanders left the meeting as quickly as possible. She did not tell anyone about what had occurred because she thought that no one would believe her since defendant was a judge and was influential in the community. Subsequently, Sanders telephoned defendant and told him she needed to meet with him. She went to defendant's chambers, told him she did not appreciate his actions, and received an apology from him.

Sanders continued to have weekly meetings with defendant. However, after she confronted him about his actions, he began complaining about the quality of her work, and, eventually, he took away her superviso-

ry authority. Sanders testified that she believed defendant took away her supervisory authority in retaliation for her confrontation with him. She testified that she considered quitting her job, but she remained in her position because she believed she was helping the children she worked with.

Defendant testified that he was often alone with Sanders in his chambers; however, he denied ever touching her breast. He testified that prior to the alleged incident, he and Sanders would hug and kiss each other as a friendly greeting. Defendant testified that he stopped such behavior after Sanders told him she was no longer comfortable hugging him.

In the fall of 1990, defendant hired Patty Mahoney to be his secretary. Mahoney was recently divorced and had two young children to support. Mahoney understood that defendant was her supervisor and had the power to fire her. Mahoney was uncomfortable with defendant because she felt that he had inappropriately hugged her during her job interview. However, she accepted the job because, for a person without a college degree, it was a good job in Dyersburg.

Mahoney testified that she worked for defendant for two weeks, but she quit when it became apparent that he was not going to leave her alone. She testified that while she worked in defendant's chambers, he would hug her or touch her on her breasts or buttocks. By the second day of her employment, defendant began to firmly place his hands on her breasts.

Mahoney testified that defendant eventually became more aggressive, grabbing and squeezing her breasts, rather than just placing his hands on them. She confronted him about his behavior, but he told her that if she reported his behavior it would hurt her more than it would hurt him. Mahoney testified that since the Lanier family was so powerful, she thought that no one would hire her if she reported defendant's behavior.

Despite her confrontation with defendant and her efforts to avoid being alone with defendant, the touching and grabbing of Mahoney's breasts continued on a daily basis. After deciding she would quit, Mahoney tele-phoned defendant from her home and informed him of her decision. Mahoney went to work the next day and met with defendant in his chambers. She broke down crying, telling him that she needed the job and wanted him to leave her alone. At that point, defendant put his arms around her, lifted her off the floor, and aggressively hugged her. Then, with one hand on the lower part of Mahoney's back, defendant slid her down his body and pressed his pelvis against her. That same night, Mahoney called defendant and told him she was quitting. She worked one more week because she needed the job.

Dinah Rone, a friend of Mahoney's, testified that during a meeting she had with Mahoney, Mahoney became distraught and told Rone that defendant would not keep his hands off her. Rone testified that Mahoney also told her that when she told defendant she was going to quit her job, he picked her up and rubbed his body against her.

At trial, defendant denied that he ever touched Mahoney in a sexual manner or grabbed either her breasts or buttocks. However, defendant testified that he and Mahoney hugged every day.

Vivian Archie grew up in Dyersburg and was acquainted with the Lanier family. She married in 1988 and gave birth to a daughter. She was divorced the following year. Defendant presided over her divorce proceedings and awarded the custody of her daughter to her.

In 1990, Archie was out of work and living with her parents. Archie learned that a job was available at the courthouse. She went to the courthouse, filled out an application for a secretarial position, and met with defendant in his chambers. At the outset of their meeting, defendant told Archie that her father had come to see him that day. Defendant said that Archie's father had told him that she was not a good mother, and he wanted custody of her child.

Archie became frightened and asked defendant if he was going to take her daughter away from her. Defendant told her that he could not talk about it because he was the judge who would preside over any such case. Defendant then told Archie that he had al-

ready promised the job to someone else. Archie replied that she needed the job and would do anything to get a job. She testified that she stated this because, otherwise, defendant would have leverage to take her child away.

When Archie was ready to leave, she reached across the desk to shake defendant's hand. At that point, defendant grabbed her hand, pulled her around to the end of his desk, and grabbed her hair and neck. When Archie told defendant to stop and tried to push him away, he twisted her neck and tried to fondle her. Defendant kept pulling Archie's hair and neck, and, finally, he turned around and threw her into a chair. Defendant then tried to kiss her, and each time she tried to get away, he would squeeze her neck harder. Finally, defendant stood over Archie, exposed his penis, and pulled her head down and her jaws open. He then forced his penis into her mouth and moved his pelvis back and forth with great force. Archie testified that this hurt her throat and jaw.

Defendant did not stop until he had ejaculated in Archie's mouth. Archie, who was crying, got up and went into defendant's bathroom to clean her mouth and face so that she could leave the courthouse. Archie testified that when she got home, her head was tender where defendant had pulled her hair; her neck was sore, and when she brushed her hair where defendant had pulled it, some of her hair fell out. Archie also testified that she did not scream when defendant attacked her or report the incident because she was afraid he would take custody of her child from her.

A few weeks later, defendant telephoned Archie's residence and told her mother he had a job for her. Defendant did not tell Archie's mother where the job interview would be located. Rather, he told her mother that Archie would have to come by his chambers to get the information. Archie was reluctant to call defendant; however, at her mother's insistence, she returned his telephone call. Although Archie repeatedly asked defendant to tell her where the job interview was, he insisted that she return to his chambers for the information. Archie then returned to defendant's chambers be-

lieving that if she did not, her parents would be furious with her and defendant would believe that she had told her parents about the assault.

When she arrived at defendant's chambers, he told her about a secretarial position in the office of Dr. Lynn Warner. Archie told defendant she knew where Dr. Warner's office was located because he had been her doctor since she was a child. While they were talking, defendant walked around his desk towards Archie. She tried to get out of the room, but he slammed the door closed and began kissing her. She told him to stop, but he began pulling her hair and threw her into a chair. As she was saying "no," defendant again exposed himself, turned her head, pulled her mouth open, and forced her to perform oral sex. During this period, defendant continued to grab Archie by the hair, squeeze her neck and shoulders, and pull her head back, all of which caused her great pain. Archie also testified that during this period she was crying, gagging, choking, and having trouble breathing. Defendant again ejaculated in her mouth. She ran crying into his bathroom and cleaned up her mouth and face so that she could go to her job interview.

Archie did not report either of the assaults because her child custody case had been in defendant's court, and she was afraid that defendant would take her daughter away from her. Archie testified that she subsequently met with defendant and that he asked her if she had said anything to anyone and also asked why she had not been back to see him. Defendant then asked Archie how her family life was going. Archie testified that she interpreted defendant's remarks to mean that he would permit her to keep custody of her daughter if she did not tell anyone what had happened.

At trial, defendant acknowledged that he was alone with Archie in his chambers on both of the occasions mentioned in her testimony, but he denied ever assaulting her or having oral sex with her. He testified that Archie came to him looking for a job and he told her he did not have one available, but he would let her know if he learned of one. He also admitted telling Archie that he had met her father and that her father wanted to

know how to go about getting custody of Archie's daughter.

Defendant admitted that he told Dr. Warner that Archie needed a job and that he set up an interview for her with Dr. Warner. Defendant also admitted that he told Archie to come to his chambers so he could tell her where the interview was. Defendant testified that Archie did come to his chambers and that he sent her to Dr. Warner for the interview.

Dr. Warner testified as a defense witness. He testified that Archie never told him that defendant forced her to have sex with him. On cross-examination, Warner testified that Archie did tell him that defendant requested oral sex and that she performed oral sex. Dr. Warner also testified on cross-examination that he discussed Archie with defendant, and defendant told him that Archie might be willing to provide sexual favors. As a result, Warner agreed to interview Archie for the job.

On the day of the job interview and after the second alleged assault, defendant telephoned Warner to tell him that Archie was on her way to see him. During their telephone conversation, defendant told Warner that Archie would do "anything" for a job. This was a prearranged signal from defendant to Dr. Warner that Archie was willing to perform sexual favors. Warner testified that after defendant said the magic words, Archie came in for an interview and he hired her.

Leigh Ann Johnson, defendant's daughter, testified for the defense. Johnson testified that she had known Vivian Archie all of her life and that Archie was a pathological liar. Colleen Fleming, a friend of Archie, also testified for the defense. Fleming testified that after both of the sexual assaults were alleged to have occurred, she had a conversation with Archie, and during this conversation, Archie stated that she had never had sex with defendant.

In addition, seven other witnesses testified for the defense. These witnesses were: Donna Forsythe McDevitt, Archie's sister; Larry Johnson; Keith Underwood; Kathy Walker; Heather Willis; Stewart Green; and Delta Willis. All of these witnesses testified that they had known Archie for a lengthy period of time and that she had a reputation for untruthfulness in the community.

In March 1991, defendant hired Sandy Attaway, age 26, to be his secretary. After her first month of work, defendant began making sexual comments to Attaway. He told Attaway that he would loan her money and they could work out a payment. He also asked Attaway what she would do for him if he let her off from work. Finally, defendant told Attaway that he knew how he could relieve her stress and she could relieve his. Attaway believed these comments referred to sex.

Defendant also asked Attaway if she were afraid of him. She testified that she told him "no," although that was untrue, because she did not want him to think she was weak and could be intimidated. Defendant told Attaway that he was a judge, and everyone should be afraid of him.

Defendant then went from sexual comments to physical contact with Attaway. He began hitting her on the buttocks when she walked by him. Further, when Attaway was in defendant's chambers to have him sign some papers, he walked around behind her and threw his arms around her. Defendant then pushed his pelvic area into Attaway's buttocks and began making a grinding motion. She could tell that defendant's penis was erect because she felt him rubbing it against her. Attaway then yelled at defendant to stop. He told her to lower her voice because there were people in the courtroom, and defendant was afraid they would hear Attaway.

Attaway testified that she told her cousin, Tina Brock, about the incident. Brock testified that, over the telephone, Attaway told her that defendant had come up behind her and rubbed his pelvic area into her buttocks.

Attaway did not quit after the assault because she needed the job. However, three months later, defendant terminated Attaway on the ground that things were not working out. Attaway testified that she saw defendant at the courthouse after he had terminat-

ed her, and defendant told her they would have gotten along fine if she had liked to have oral sex.

Defendant testified regarding Attaway's allegations. He denied sexually assaulting her in any way.

In the fall of 1991, Fonda Bandy met with defendant in his chambers concerning her work for a federal program, Drug Free Public Housing. Bandy wanted to implement a new program of parenting classes for parents who lived in public housing and had children before the juvenile court. Since defendant was the juvenile court judge, Bandy arranged a presentation about the program for him. She hoped that he would refer parents to her program as part of their children's sentencing.

After Bandy's presentation, defendant asked her some questions about the program. Defendant then began asking Bandy personal questions, such as whether or not she was married.

Bandy testified that when she began to leave defendant's chambers, he put his arms around her and started kissing her. As she tried to turn and pull away, defendant put one of his hands behind her head and pulled her up to him. Defendant then began to fondle one of Bandy's breasts and she tried to push him away. When she eventually pulled herself free, Bandy saw that defendant had lipstick all over him.

Bandy was shaken and panicked, and she went into the bathroom to clean herself up before leaving defendant's chambers. After she left the bathroom, Bandy had to walk past defendant's desk to exit his chambers. As she walked by, defendant, who was sitting on the end of his desk nearest the door, reached out and put his hand on Bandy's crotch. Bandy momentarily hesitated and then kept on walking towards the door. Defendant followed her to the door and told her that if she came back, she would have all the clients that she wanted for her new program.

Bandy testified that she never returned to see defendant because she did not want to have to go through that kind of treatment again. Defendant only referred two individuals to Bandy's program. These two individuals had cases pending before defendant at the time of his meeting with Bandy, and defendant and Bandy had discussed their cases. Bandy testified that she did not report the incident with defendant because he was a judge and she did not want too many people to know about it.

Defendant testified and admitted that he had met with Bandy alone in his chambers. He denied ever sexually assaulting Bandy. Defendant also testified that after their meeting, Bandy came over to him and hugged and kissed him.

At the close of the trial, the district court granted defendant's motion for a judgment of acquittal on count 9 of the indictment. On December 18, 1992, the jury found defendant not guilty on counts 1, 3, and 10 of the indictment. However, the jury returned guilty verdicts on counts 2, 4, 5, 6, 7, 8, and 11 of the indictment.

Sentencing hearings were held on March 26 and April 12, 1993. On April 12, 1993, defendant was sentenced to one year's imprisonment on each of counts 2, 4, 5, 8, and 11. Defendant was sentenced to ten years' imprisonment on each of counts 6 and 7. Defendant's sentence on each count was to be served consecutively to the others, resulting in a total sentence of 25 years' imprisonment. Defendant's sentence was to be followed by two years of supervised release, and he was ordered to pay a fine of $25,000. Further, defendant was ordered to pay, as costs of incarceration, $1,492 per month during the period of his incarceration, provided that he was entitled to receive and did receive a pension from the State of Tennessee. This timely appeal followed.

## II.

### A.

Defendant argues that the government failed to prove all the necessary elements of a violation of 18 U.S.C. § 242 beyond a reasonable doubt. Specifically, he asserts that the government failed to show that he was acting under color of law when he assaulted his victims, that the government failed to show he acted willfully, that the government

failed to show that his actions denied the constitutional rights of his victims, and that the government failed to show that Vivian Archie suffered any bodily injury.

■ Sufficient evidence exists to support a conviction if, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could accept the evidence as establishing each essential element of the crime. *See Jackson v. Virginia,* 443 U.S. 307, 324, 99 S.Ct. 2781, 2792, 61 L.Ed.2d 560 (1979). Title 18 U.S.C. § 242 (1969 & Supp.1994) states:

> Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any inhabitant of any State, Territory, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such inhabitant being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined not more than $1,000 or imprisoned not more than one year, or both; and if bodily injury results shall be fined under this title or imprisoned not more than ten years, or both; and if death results shall be subject to imprisonment for any term of years or for life.

■ Defendant first argues that the government did not establish that he deprived the victims of a constitutional right. In his brief on appeal, defendant acknowledges that at trial he took the position that "freedom from sexual assault" was a recognized constitutional right. He states, however, that after further research and consideration he has changed his position on appeal. Brief of Appellant at 18–19. Nevertheless, although defendant asserts that after research and consideration he has determined that freedom from sexual assault is not a recognized right, he cites no authority for this proposition in his brief.[2]

In *Screws v. United States,* 325 U.S. 91, 105, 65 S.Ct. 1031, 1037, 89 L.Ed. 1495, (1945) the Supreme Court stated that

> willful violators of constitutional requirements, which have been defined, certainly are in no position to say that they had no adequate advance notice that they would be visited with punishment. When they act willfully in the sense in which we use the word, they act in open defiance or in reckless disregard of a constitutional requirement which has been made specific and definite.

Thus, the decision in *Screws* established "that once a due process right has been defined and made specific by court decisions, the right is encompassed by § 242." *United States v. Hayes,* 589 F.2d 811, 820 (5th Cir.), *cert. denied,* 444 U.S. 847, 100 S.Ct. 93, 62 L.Ed.2d 60 (1979).

In this case, the government established that the defendant, a State of Tennessee judge, violated the victims' constitutional right; namely, their right to bodily integrity. Further, the right to bodily integrity has been defined and made specific by court decision. "[T]he right to be free of state-occasioned damage to a person's bodily integrity ... [is] protected by the [F]ourteenth [A]mendment guarantee of due process, and the [F]ourth [A]mendment guarantee of [T]he right of ... people to be secure in their persons, made applicable to the states by the [F]ourteenth [A]mendment." *Jamieson v. Shaw,* 772 F.2d 1205, 1210 (5th Cir.1985) (citations and quotations omitted). " 'It is settled now ... that the Constitution places limits on a State's right to interfere with a person's ... bodily integrity.' " *Canedy v. Boardman,* 16 F.3d 183, 185 (7th Cir.1994) (quoting *Planned Parenthood v. Casey,* ——— U.S. ———, ———, 112 S.Ct. 2791, 2806, 120 L.Ed.2d 674 (1992)).

Individuals also have a "historic liberty interest ... encompass[ing] freedom from bodily restraint and punishment."

---

2. The First Circuit has stated that where a defendant makes a passing reference to an issue, but "presents no reasoned discussion of, or analysis addressed to, the ... issue," the matter is ended. *Cook v. Rhode Island,* 10 F.3d 17, 21 (1st Cir. 1993). The First Circuit also stated that it firmly adheres to the principle "that issues adverted to on appeal in a perfunctory manner, not accompanied by some developed argumentation, are deemed to have been abandoned." *Id.* (internal quotations omitted). We adopt the reasoning of the First Circuit.

*Ingraham v. Wright,* 430 U.S. 651, 673–74, 97 S.Ct. 1401, 1413–14, 51 L.Ed.2d 711 (1977). Although the contours of this historic liberty interest have not been precisely defined, one aspect of this liberty interest is the right of personal security protected by the Fourth Amendment. *Id.* The overriding function of the Fourth Amendment is to "protect personal privacy and dignity against unwarranted intrusion by the State." *Id.* at 673 n. 42, 97 S.Ct. at 1413 n. 42 (quoting *Schmerber v. California,* 384 U.S. 757, 767, 86 S.Ct. 1826, 1834, 16 L.Ed.2d 908 (1966)). This historic liberty interest is violated when a state actor sexually assaults, or sexually molests, anyone. *Doe v. Taylor Indep. Sch. Dist.,* 15 F.3d 443, 451 (5th Cir.1994) (en banc), *pet. for cert. filed,* No. 93–1918 (June 1, 1994).[3]

The record in this case shows that the evidence was sufficient with regard to each count of conviction to establish that defendant sexually assaulted the victims. Since the victims had a constitutionally protected right not to be sexually assaulted by a state actor, defendant deprived them of their constitutional rights.

▇▇ Second, defendant argues that if his convictions are upheld by this court, "any unwanted sexual touching ... [can] become[] the trigger for [a] serious federal crime." Brief of Appellant at 27. However, the district court instructed the jury that:

> Freedom from such physical abuse includes the right to be free from certain sexually motivated physical assaults and coerced sexual battery. It is not, however, every unjustified touching or grabbing by a state official that constitutes a violation of a person's constitutional rights. The physical abuse must be of a serious and substantial nature that involves physical force, mental coercion, bodily injury or

emotional damage which is shocking to one's conscience.

J.A. 884–85. Juries are presumed to follow the court's instructions. *Zafiro v. United States,* —— U.S. ——, ——, 113 S.Ct. 933, 939, 122 L.Ed.2d 317 (1993). Thus, it is clear from the record and the trial court's instructions that the jury did not convict defendant merely because of "unwanted sexual touching."

▇▇ Third, defendant argues that the government failed to show that he acted willfully. In *Screws,* the Court held that the reference to willfulness in § 242 requires proof of a specific intent or purpose "to deprive a person of a federal right made definite by decision or other rule of law." *Screws,* 325 U.S. at 103, 65 S.Ct. at 1036. It is not material whether or not the defendant was thinking in constitutional terms; rather, a defendant acts willfully when he "act[s] in open defiance or in reckless disregard of a constitutional requirement which has been made specific and definite." *Id.* at 105, 65 S.Ct. at 1037. *See United States v. O'Dell,* 462 F.2d 224, 232 n. 10 (6th Cir.1972) (accord).

The proof in this case established that defendant intentionally engaged in wrongful conduct, not by mistake or accident, each time he assaulted one of his victims. Moreover, each time defendant assaulted one of his victims, he acted in defiance and disregard of her constitutional right to bodily integrity; namely, her right to be free from sexual assault. Further, there is evidence in the record which shows that either prior to or after the assaults, defendant took steps to coerce or intimidate his victims into silence. From this evidence, a reasonable juror could infer that defendant knew his actions in assaulting his victims were wrong. Accordingly, we conclude that the evidence amply

**3.** In examining the issue as to whether defendant in this case violated a constitutional right, we also look to civil cases arising under 42 U.S.C. § 1983, even though this is a criminal prosecution under 18 U.S.C. § 242. As the Ninth Circuit has stated:

> There is thus nothing wrong with looking to a civil case brought under 42 U.S.C. § 1983 for guidance as to the nature of the constitutional right whose alleged violation has been made the basis of a section 242 charge. The protec-

tions of the Constitution do not change according to the procedural context in which they are enforced—whether the allegation that constitutional rights have been transgressed is raised in a civil action or in a criminal prosecution, they are the same constitutional rights.

*United States v. Reese,* 2 F.3d 870, 884 (9th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 928, 127 L.Ed.2d 220 (1994). See also *United States v. Bigham,* 812 F.2d 943, 948 (5th Cir. 1987).

shows that defendant acted willfully in this case.

■ Fourth, defendant argues that the government failed to show that he was acting under color of law at the time he assaulted his victims. An act is under color of law when it constitutes a "'[m]isuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *United States v. Tarpley,* 945 F.2d 806, 809 (5th Cir.1991) (quoting *United States v. Classic,* 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368 (1941)), *cert. denied,* —— U.S. ——, 112 S.Ct. 1960, 118 L.Ed.2d 562 (1992). "[U]nder 'color' of law [also] means under 'pretense' of law." *Id.* (quoting *Screws,* 325 U.S. at 111, 65 S.Ct. at 1040). "Acts of officers who undertake to perform their official duties are included whether they hew to the line of their authority or overstep it," but, "acts of officers in the ambit of their personal pursuits are plainly excluded." *Screws,* 325 U.S. at 111, 65 S.Ct. at 1040. "[I]ndividuals pursuing private aims *and* not acting by virtue of state authority are not acting under color of law purely because they are state officers." *Tarpley,* 945 F.2d at 809.

Defendant argues that his actions in this case were personal pursuits. However, the jury correctly concluded that defendant's actions in this case were taken under color of state law. First, all of the assaults took place in defendant's chambers during working hours, and during each assault, there was at least an aura of official authority and power. Three of the victims, Sandy Sanders, Patty Mahoney, and Sandy Attaway, were present in defendant's chambers because they were working for him. On the first occasion Vivian Archie was assaulted, she had gone to defendant's chambers to apply for a secretarial position. On the second occasion Archie was assaulted, defendant used his continuing authority to determine custody of her child to coerce her into returning to his office. Finally, Fonda Bandy was assaulted while she was present in defendant's chambers to make a presentation about her parenting classes for juvenile offenders.

Further, there was evidence that defendant used his position to intimidate his victims into silence. Prior to the first assault, defendant told Archie that her father wanted to know how he could go about seeking custody of her child. Defendant was also able to coerce Archie back into his office a second time because he knew she needed a job in order to ensure that she would keep custody of her child.

Defendant also used his position to effectively demote Sandy Sanders after he assaulted her. He told Sandy Attaway that she should be afraid of him because he was a judge, and he fired her after he assaulted her. Defendant also told Patty Mahoney that it would hurt her more than it would hurt him if she told anyone about his assault. Finally, after assaulting Fonda Bandy, defendant told her that he would see to it that she got all of the clients she needed for her parenting classes if she would come back to see him.

Consequently, the government presented sufficient evidence for a rational juror to decide that defendant was acting under color of state law and not merely for his own personal pursuits when he assaulted the victims. Moreover, contrary to defendant's assertions, the government did not establish that he acted under color of state law based merely upon the subjective impressions of his victims. The government presented considerable objective evidence, as described above, which supported the jury's conclusion that defendant acted under color of state law.

Furthermore, we wish to emphasize that his case involves much more than a defendant who is a mere public official. Rather, this case involves a state judge who committed various abhorrent and unlawful sexual acts in his chambers, oftentimes while wearing his judicial robe. We consider such egregious misconduct on the part of defendant to be shocking to the conscience of the court.

■ Finally, defendant argues that Vivian Archie did not suffer bodily injury. Counts 6 and 7 charged that defendant's assaults of Vivian Archie resulted in her suffering bodily injury. Under 18 U.S.C. § 242, bodily injury makes the sexual assault a felony, punishable by up to ten years' imprisonment.

Defendant argues that the district court wrongly instructed the jury on the meaning of bodily injury. Defendant did not, however, object to the jury instruction at trial. Thus, the court's instruction will be reviewed only for plain error. *See United States v. Thomas,* 11 F.3d 620, 629 (6th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1570, 128 L.Ed.2d 214 (1994).

The district court instructed the jury that

bodily injury means any injury, no matter how temporary. Bodily injury also includes physical pain as well as any burn, cut, abrasion, bruise, disfigurement, illness or impairment of a bodily function.

J.A. 886–87. Defendant argues that the district court should have used the definition of serious bodily injury from 18 U.S.C. § 247(e)(2). However, 18 U.S.C. § 242 does not require serious bodily injury; it only requires bodily injury. Moreover, although bodily injury is not defined in § 242, it is defined in four other provisions of Title 18 of the United States Code. In these four provisions, Congress gave the term bodily injury the same meaning, providing that bodily injury includes "a cut, abrasion, bruise, burn, or disfigurement," "physical pain," "illness," "impairment of a function of a bodily member, organ or mental faculty," or "any other injury to the body, no matter how temporary." *See* 18 U.S.C. §§ 831(f)(4), 1365(g)(4), 1515(a)(5), 1864(d)(2). The jury instructions given by the district court are consistent with the definitions of bodily injury used in Title 18. Further, in *United States v. Myers,* 972 F.2d 1566, 1572–73 (11th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1813, 123 L.Ed.2d 445 (1993), the Eleventh Circuit held that jury instructions in a § 242 prosecution which defined bodily injury as "injury to the body, no matter how temporary, ... includ[ing] physical pain as well as any burn or abrasion," were not erroneous. Accordingly, the district court's jury instructions on bodily injury were not plain error. *See United States v. Olano,* —— U.S. ——, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).

■ Finally, defendant argues that there was insufficient evidence that Archie suffered bodily injury. However, Archie's testimony at trial was sufficient to establish that after both assaults she suffered bodily injury as defined above, beyond a reasonable doubt.

### B.

■ Defendant argues that the district court abused its discretion in failing to grant his pretrial motion to sever the trial of the three felony counts from the eight misdemeanor counts charged in the indictment. Defendant asserts that he was prejudiced because of the district court's failure to grant a severance. He argues that if the two charges involving Vivian Archie, counts 6 and 7, had been tried separately, he would have been acquitted of those charges because Archie's testimony lacked credibility.

■ A motion for severance pursuant to Federal Rule of Criminal Procedure 14 is committed to the sound discretion of the trial court. *United States v. McCoy,* 848 F.2d 743 (6th Cir.1988). A defendant making a motion for severance under Rule 14 has the burden of demonstrating a strong showing of prejudice. *United States v. Goldman,* 750 F.2d 1221, 1225 (4th Cir.1984). "To show enough prejudice to require severance, a defendant must establish 'substantial prejudice,' 'undue prejudice,' or 'compelling prejudice.'" *United States v. Warner,* 971 F.2d 1189, 1196 (6th Cir.1992) (citations omitted). Further, it is not enough to justify a severance for a defendant to show that joinder has made his defense more difficult or that separate trials might have offered him a better chance of acquittal. *Goldman,* 750 F.2d at 1225.

In this case, the district court did not abuse its discretion in denying defendant's motion for severance because defendant failed to establish either substantial, undue, or compelling prejudice. Accordingly, this issue is meritless.

### C.

■ Defendant argues that the district court erred in failing to dismiss the indictment on the ground that the charges contained in the indictment were impermissibly vague. Defendant asserts that although each misdemeanor count in the indictment alleged a specific act of defendant, the counts also

referred to allegations that he otherwise molested the victims, which was not adequate notice of the charges against him.

■ An indictment is sufficient if it contains the elements of the offense charged and fairly informs a defendant of the charges against which he must defend. *Allen v. United States,* 867 F.2d 969, 971 (6th Cir. 1989) (citing *Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974)). The courts use a common sense approach in determining whether an indictment sufficiently informs a defendant of an offense. *Id.* "The true test of the sufficiency of an indictment is not whether it could have been made more definite and certain, but whether it ... sufficiently apprises the defendant of what he must be prepared to meet...." *United States v. Debrow,* 346 U.S. 374, 376, 74 S.Ct. 113, 114, 98 L.Ed. 92 (1953) (quoting *Cochran v. United States,* 157 U.S. 286, 290, 15 S.Ct. 628, 630, 39 L.Ed. 704 (1895)).

In this case, each count in the indictment was sufficient to inform the defendant of the charges against him. Furthermore, although the misdemeanor allegations in the indictment did use the language "and otherwise molested," this language clearly did not prejudice defendant's ability to defend himself at trial because he was able to obtain an acquittal on four of the eleven charges in the indictment. Moreover, in his brief on appeal, defendant acknowledges that in the indictment, the government put him on notice of at least one specific act in each count of the indictment, and the government's case was directed to establishing the specific or particular acts charged in the indictment. Thus, defendant clearly had notice of the charges against him, and, as stated, defendant was able to mount a successful defense to some of those charges.

At trial, defense counsel objected to the admission of evidence that defendant otherwise molested his victims. For instance, with regard to Sandy Sanders, one of the government's witnesses, the court admitted Sanders' testimony that defendant had grabbed her and kissed her. In counts 2 and 3 of the indictment defendant was charged with willfully grabbing Sanders' breasts and buttocks. Defendant argues that this evidence should not have been admitted under Federal Rule of Evidence 404(b) and that he should have been given notice that the government intended to seek admission of this testimony. However, Rule 404(b) was not implicated. "An act is not extrinsic, and Rule 404(b) is not implicated, where the evidence of that act and the evidence of the crime charged are inextricably intertwined." *United States v. Torres,* 685 F.2d 921, 924 (5th Cir.1982) (per curiam). Here, the evidence that defendant grabbed and kissed Sanders is inextricably intertwined with the evidence that defendant grabbed her breasts and buttocks, because all three acts were part of an ongoing pattern in which defendant sexually assaulted Sanders. Thus, the district court did not err in admitting Sanders' testimony and similar testimony of defendant's other victims. Further, defendant has not shown that he was prejudiced in any manner by the alleged lack of notice that the government would use this testimony.

### D.

■ Defendant argues that the statute, 18 U.S.C. § 242, is void for vagueness. One of the basic principles of due process is that a statute can be void for vagueness if its prohibitions are not clearly defined. *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972). In *Screws v. United States,* 325 U.S. 91, 104, 65 S.Ct. 1031, 1037, 89 L.Ed. 1495 (1945), the Supreme Court held that 18 U.S.C. § 242 was not unconstitutionally vague if it were read to require "an intent to deprive a person of a right which has been made specific either by the express terms of the Constitution or laws of the United States or by decisions interpreting them." Further, in rejecting the vagueness challenge to § 242, the Court ruled that "a requirement of a specific intent to deprive a person of a federal right made definite by decision or other rule of law saves [§ 242] from any charge of unconstitutionality on the grounds of vagueness." *Id.* at 103, 65 S.Ct. at 1036.[4]

---

**4.** *Screws* interpreted the text of 18 U.S.C. § 242 as it was written in 1942. Section 242 was

Thus, *Screws* established "that once a due process right has been defined and made specific by court decisions, the right is encompassed by § 242." *United States v. Hayes*, 589 F.2d 811, 820 (5th Cir.), *cert. denied*, 444 U.S. 847, 100 S.Ct. 93, 62 L.Ed.2d 60 (1979).

In this case, the due process right of the victims, their right to bodily integrity which defendant violated, has been defined and made specific by court decisions. *See Jamieson v. Shaw*, 772 F.2d 1205, 1210 (5th Cir 1985); *Canedy v. Boardman*, 16 F.3d 183, 185 (7th Cir.1994). Accordingly, the right of the victims violated by defendant in this case is encompassed by § 242. Therefore, defendant's argument that the statute is unconstitutionally vague is meritless.

### E.

Defendant argues that the district court abused its discretion by limiting his counsel's cross-examination of one of the government's witnesses, Vivian Archie. Specifically, defendant asserts that the district court abused its discretion when (1) it limited cross-examination of Archie concerning her prior sexual conduct and (2) it limited cross-examination of Archie concerning her prior drug use.

 Beyond the essentials of cross-examination, the district court in the exercise of its discretion can limit the right to cross-examination. *Dorsey v. Parke*, 872 F.2d 163, 166 (6th Cir.), *cert. denied*, 493 U.S. 831, 110 S.Ct. 103, 107 L.Ed.2d 67 (1989). An abuse of discretion is found where the trial court has interfered with a defendant's constitutional right to cross-examination. *Id.* However, where the trial court curtails the defendant's cross-examination of the government's "star" witness, its ruling must be more carefully scrutinized. *United States v. Brown*, 946 F.2d 1191, 1195–96 (6th Cir.1991).

 If the cross-examination "reveals sufficient information to appraise the witnesses' veracity," the Sixth Amendment right to confront witnesses is satisfied. *Dorsey*, 872 F.2d at 167 (quoting *United States v.*

*Falsia*, 724 F.2d 1339, 1343 (9th Cir.1983)). "[T]he bounds of the trial court's discretion are exceeded when the defense is not allowed to 'plac[e] before the jury *facts* from which bias, prejudice or lack of credibility of a prosecution witness might be inferred[.]' " *Id.* (quoting *United States v. Garrett*, 542 F.2d 23, 25 (6th Cir.1976)).

 Here, the district court's decision to limit cross-examination of Archie concerning her prior sexual conduct was not an abuse of discretion. "[A]bsent circumstances which enhance its probative value, evidence of a rape [or sexual assault] victim's unchastity, whether in the form of testimony concerning her general reputation or direct or cross-examination testimony concerning specific acts with persons other than the defendant, is ordinarily insufficiently probative either of her general credibility as a witness or of her consent to intercourse with the defendant on the particular occasion charged to outweigh its highly prejudicial effect." *United States v. Kasto*, 584 F.2d 268, 271–72 (8th Cir.1978) (footnotes omitted), *cert. denied*, 440 U.S. 930, 99 S.Ct. 1267, 59 L.Ed.2d 486 (1979).

In addition, Federal Rule of Evidence 608(b) states in relevant part:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, ... in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness

. . . . .

Furthermore, Fed.R.Evid. 412(b) also limits the admissibility of evidence concerning the past sexual behavior of a victim in a criminal case in which the defendant is accused of a sexual offense.

Thus, the testimony which the defense sought to elicit during cross-examination of

amended in 1968; however, the 1968 amendments did not render the statute unconstitutionally vague. *United States v. Hayes*, 589 F.2d 811,

819–20 (5th Cir.), *cert. denied*, 444 U.S. 847, 100 S.Ct. 93, 62 L.Ed.2d 60 (1979).

Vivian Archie would simply have been an attack on Archie's character. Accordingly, the district court did not err in limiting Archie's testimony concerning her past sexual conduct.

▮ Further, the district court did not abuse its discretion in limiting cross-examination of Archie concerning her prior drug use. "A witness' use of drugs is only relevant as to the ability of the witness to perceive the underlying events and testify lucidly at trial." *Jarrett v. United States,* 822 F.2d 1438, 1445 (7th Cir.1987). In this case, the defense did elicit testimony from Archie admitting that she was heavily involved with drugs both before and after the assaults by defendant. Further, Archie testified that she did not use drugs and was not under the influence of drugs at the time of either of the two assaults by the defendant. Moreover, Archie was able to clearly perceive the events underlying both of the assaults and to testify lucidly about them at trial. Finally, despite the district court's limitation of the cross-examination of Vivian Archie concerning her prior drug use, the jury was not under the impression that she was a model citizen. Not only did Archie admit that she was a long-term drug addict, but the defense also put on seven witnesses who testified as to her reputation for untruthfulness. Accordingly, the district court's limitation of cross-examination concerning Archie's prior drug use was not an abuse of discretion.

**F.**

▮ Defendant argues that he was denied his right to an impartial or fair jury. Prior to trial, the parties and the court learned that a copy of a local newspaper containing an article about the case had been left in the jury room. Defendant argues that as a result of the presence of the newspaper in the jury room, the court should have excused the jury panel and permitted the selection of a new jury panel. Defendant also asserts that the court should have permitted an individual voir dire of the jury panel.

▮ "[T]he jury's verdict [must] be based on evidence received in open court, and not from outside sources." *Sheppard v.*

*Maxwell,* 384 U.S. 333, 351, 86 S.Ct. 1507, 1516, 16 L.Ed.2d 600 (1966). A new trial is not required merely because the jury has been exposed to material not in evidence. Rather, a new trial is required only when a reasonable possibility exists that the material affected the jury's verdict. *United States v. Weisman,* 736 F.2d 421, 424 (7th Cir.), *cert. denied,* 469 U.S. 983, 105 S.Ct. 390, 83 L.Ed.2d 324 (1984); *United States v. Hill,* 688 F.2d 18, 19 (6th Cir.) (per curiam), *cert. denied,* 459 U.S. 1074, 103 S.Ct. 498, 74 L.Ed.2d 638 (1982). Such a determination depends upon the particular facts of each case, with the critical factor being the degree and pervasiveness of the prejudicial influence possibly resulting from the jury's exposure to the extraneous material. *Weisman,* 736 F.2d at 424. This court reviews a trial court's determination of prejudice for an abuse of discretion. *Id.* Furthermore, "[i]n considering the effect of ... extra-judicial material on the jury the District Court has a large discretion in ruling on the issue of prejudice resulting from the reading by jurors of news articles concerning the trial." *United States v. Van Dyke,* 605 F.2d 220, 229 (6th Cir.), *cert. denied,* 444 U.S. 994, 100 S.Ct. 529, 62 L.Ed.2d 425 (1979). The Supreme Court has

> stressed the wide discretion granted to the trial court in conducting *voir dire* in the area of pretrial publicity and in other areas of inquiry that might tend to show juror bias. Particularly with respect to pretrial publicity, we think this primary reliance on the judgment of the trial court makes good sense. The judge of that court sits in the locale where the publicity is said to have had its effect, and brings to his evaluation of any such claim his own perception of the depth and extent of news stories that might influence a juror.

*Mu'Min v. Virginia,* 500 U.S. 415, 427, 111 S.Ct. 1899, 1906, 114 L.Ed.2d 493 (1991).

In this case, the district court permitted a voir dire of the jurors and did not find prejudice sufficient to delay the trial and obtain a new jury panel. Although defendant argues that the district court should have had a sequestered voir dire of the jurors, defendant has not identified any prejudice resulting

from the district court's action. Accordingly, the district court did not abuse its discretion.

## G.

Defendant argues that the district court abused its discretion in denying his motion for a mistrial based on alleged factual misstatements in the government's opening statement. "In order to deny a defendant a fair trial, prosecutorial misconduct and improper argument must be 'so pronounced and persistent that it permeate[d] the entire atmosphere of the trial.'" *United States v. Castro,* 908 F.2d 85, 89 (6th Cir.1990) (quoting *United States v. Vance,* 871 F.2d 572, 577 (6th Cir.), *cert. denied,* 493 U.S. 933, 110 S.Ct. 323, 107 L.Ed.2d 313 (1989)). "Inappropriate remarks by the prosecutor do not alone justify reversal of a criminal conviction in an otherwise fair proceeding, as long as the jury's ability to judge the evidence fairly remains intact." *Id.* (citing *United States v. Young,* 470 U.S. 1, 11–12, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985)). "In order to decide if the prosecutor's remarks denied the defendant a fair trial, a reviewing court may consider, along with other factors, the potential of the remarks to prejudice the defendant or confuse the jury and the strength of proof against the defendant." *Id.* (citing *Angel v. Overberg,* 682 F.2d 605, 608 (6th Cir. 1982)). Furthermore, in reviewing the prosecutor's remarks and argument, this court must remember the Supreme Court's statement that in his arguments "the prosecutor could 'strike hard blows but not foul ones.'" *United States v. Steinkoetter,* 633 F.2d 719, 720 (6th Cir.1980) (quoting *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935)).

█ In this case, however, defense counsel did not object to the prosecutor's opening statement until the day after the statement was made. Accordingly, this court's review is limited to plain error, *see United States v. Levy,* 904 F.2d 1026, 1029–1030 (6th Cir. 1990), *cert. denied,* 498 U.S. 1091, 111 S.Ct. 974, 112 L.Ed.2d 1060 (1991), using the standard enunciated by the Supreme Court in

*United States v. Olano,* —— U.S. ——, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).

█ Nevertheless, regardless of which standard is used, the district court did not err in denying defendant's motion for a mistrial. Defendant claims that the government did not present any evidence supporting some of the remarks made by the prosecutor during his opening statement. He asserts that the government failed to offer any proof supporting the prosecutor's statement that the jury would hear that defendant masturbated in front of some of the victims. However, Ruby Sipes testified that while she was present in defendant's chambers, "he had both hands on his penis and he was masturbating." J.A. 714. Defendant also challenges the prosecutor's statement that if defendant did not like the women who worked for him, he would terminate them and they would lose their livelihood. However, Sandy Attaway testified that defendant fired her because "things just weren't working out between us." J.A. 435.

Defendant further argues that the prosecutor's description of defendant's conversation with Vivian Archie's father concerning her father's desire to obtain custody of Archie's baby was unsupported by the evidence. However, Archie and defendant testified about this conversation. Defendant further challenges the prosecutor's description of Fonda Bandy's parenting program. However, Bandy not only testified about her parenting program, she also testified that due to defendant's position as a juvenile court judge, defendant was the only person who could make her parenting program a success.

█ Defendant also challenges the prosecutor's statement that he was the only judge that an individual in Dyer County could go to for a divorce, child support, or child custody case.[5] Defendant correctly points out that witnesses testified that the circuit judge could also hear such cases. Nevertheless, defendant testified that although he and the circuit judge had concurrent jurisdiction over divorce cases and related proceedings, he heard approximately 80 to 90 percent of the divorce cases and that if he heard a divorce

---

5. Defendant did immediately object to this statement by the prosecutor.

case he would follow it through to the end, including child custody and child support matters as well. This testimony shows that even though the prosecutor's remarks were technically inaccurate, the broad proposition that the prosecutor was trying to make was correct; namely, for all practical purposes, defendant was likely to preside over a divorce proceeding and related matters in Dyer County.

Accordingly, the prosecutor's remarks during his opening statement did not deprive defendant of a fair trial. Therefore, the district court did not err in denying defendant's motion for a mistrial based upon the prosecutor's opening statements.

## H.

■■■ Defendant argues that the prosecutor made improper comments during his closing argument and that these comments deprived him of a fair trial. Defense counsel did not object to the prosecutor's closing argument at the time of the argument. However, he did object to certain phraseology used by the prosecutor the day after the prosecutor's argument. Where, as here, a defendant fails to make a contemporaneous objection to the prosecutor's comments, a conviction will stand absent a finding of plain error. *United States v. Cummins,* 969 F.2d 223, 227 (6th Cir.1992); *Levy,* 904 F.2d at 1030. In reviewing alleged prosecutorial misconduct for plain error, "it is necessary that the error be measured not within the narrow confines of the [prosecutor's] argument but against the entire record." *United States v. Ebens,* 800 F.2d 1422, 1438 (6th Cir.1986). Under Federal Rule of Criminal Procedure 52(b), a court of appeals should correct a plain error if the error, "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *United States v. Olano,* — U.S. —, —, 113 S.Ct. 1770, 1779, 123 L.Ed.2d 508 (1993) (quoting *United States v. Atkinson,* 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936)).

■■■ Defendant first asserts that the prosecutor improperly vouched for the credibility of the government's witnesses. "Improper vouching occurs when a jury could reasonably believe that a prosecutor was in-

dicating a personal belief in a witness' credibility." *Taylor v. United States,* 985 F.2d 844, 846 (6th Cir.1993) (per curiam) (citing *United States v. Causey,* 834 F.2d 1277, 1283 (6th Cir.1987), *cert. denied,* 486 U.S. 1034, 108 S.Ct. 2019, 100 L.Ed.2d 606 (1988)). During closing argument, the prosecutor told the jury:

And you need to make a credibility evaluation, there is no question about that. It really [is] a question of whether [defendant] is telling the truth or these women are telling the truth. And you know, that is why you are here. That is why you get to look at the witnesses when they are testifying, because you have to decide who is telling the truth. You look at their demeanor, their facial expressions, look at their body language and use your common sense. You listen to what they say, did it make sense. Are they telling you the truth or are they making it up. And you can compare the demeanor of [defendant] on that stand with the way the women looked on the stand.

J.A. 850–51. Defendant's assertion of improper vouching by the prosecutor is meritless.

■■■ Second, defendant asserts that the prosecutor improperly challenged his credibility. However, defendant took the witness stand and expressly testified that the testimony of the government witnesses was false. A prosecutor has reasonable latitude in fashioning his closing arguments, and in a case involving two essentially conflicting stories, it is reasonable to infer, and to argue, that one side is lying. *United States v. Molina,* 934 F.2d 1440, 1441 (9th Cir.1991); *see also Whittington v. Estelle,* 704 F.2d 1418, 1422 (5th Cir.), *cert. denied,* 464 U.S. 983, 104 S.Ct. 428, 78 L.Ed.2d 361 (1983). In this case, the prosecutor's comments to the jury about the conflicts in the testimony and whether they should believe defendant's version or the victims' version was simply fair comment on the evidence presented at trial.

■■■ Third, defendant asserts that the government argued facts not in evidence when the prosecutor stated that defendant "called in every political favor in the county

to get people to come in here and say things about [the victims]." J.A. 865. This statement by the prosecutor was a reference to the fact that many of the 23 defense witnesses were called in to attack the credibility of the government's witnesses. Indeed, the prosecutor's next statements to the jury were "does anybody not have somebody that doesn't like them? Does anybody have somebody that wouldn't come in and say, 'You're a liar.'" J.A. 865–66.

■ Finally, defendant argues that the prosecutor's statement to the jury that if it believed that what defendant did was not against the law, the jury should "go back there, mark 'not guilty' on that [verdict] form ten times, and let [defendant] start court next week," was improper. J.A. 864. However, there is nothing improper about this or the above statements.

## I.

Defendant also argues that the government engaged in persistent misconduct throughout the entire trial process. As noted previously, prosecutorial misconduct warrants reversal of a conviction only if, based upon a review of the record as a whole, it "permeates the entire atmosphere of the trial." *United States v. Dandy,* 998 F.2d 1344, 1352 (6th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1188, 127 L.Ed.2d 538 (1994). However, defendant has not shown any persistent misconduct of the government which permeated the atmosphere of his trial.

■ Defendant argues that the government improperly named his two original attorneys as possible witnesses to prevent them from representing him. However, the district court rejected this argument as baseless, and defendant has pointed to no facts which would cast doubt upon the district court's decision. Further, a review of the record shows that defendant was ably represented at trial.

■ Defendant next contends that Dr. Louise Fitzgerald, an expert psychologist, was improperly permitted to remain in the courtroom with some of the victims and also met with and comforted some of the victims after their testimony. However, Fitzgerald did not testify as a witness at the trial.[6] Since Fitzgerald was not a witness at the trial before the jury, her presence in the courtroom was neither improper nor did it deprive defendant of a fair trial.

■ Defendant further asserts that the government subpoenaed Colleen Fleming to be a witness, but when she told the government that Vivian Archie had told her that she (Archie) had never had sex with defendant, she was not called as a witness and the government told her (Fleming) not to speak to anyone. Defendant asserts that the government improperly withheld this information from the defense. However, defendant acknowledges that he learned that the government had subpoenaed Fleming and, in fact, the defense presented Fleming as a witness at the trial. Fleming testified that Archie did tell her that she had never had sex with defendant. Therefore, defendant was not prejudiced by the alleged failure to disclose.

■ Defendant also asserts that an FBI agent involved with the case, Agent Castleberry, improperly invaded the witness room prior to trial when he removed a box of Kleenex tissues from the witness room. Agent Castleberry apparently entered the witness room to obtain the box of Kleenex tissues for one of the witnesses who had become upset. When Castleberry entered the room, a defense witness, Joan Lanier, was in the room. Castleberry either said "Hi" or "Hello" to Mrs. Lanier as he picked up the tissue box. Mrs. Lanier claimed that she was intimidated by Castleberry's actions as well as by the fact that she thought the Kleenex box might have contained a listening device. In this case, there is no evidence that the Kleenex box ever contained a listening or tape recording device. Further, there is no evidence that Agent Castleberry's momentary intrusion into the witness room so

---

**6.** It appears, however, that Fitzgerald may have testified at the hearing on defendant's motion for a mistrial.

intimidated Mrs. Lanier as to deprive defendant of a fair trial.

■ Defendant also asserts that the government acted improperly when it called him to testify before the grand jury which was investigating the case, even though he had previously indicated that he would exercise his Fifth Amendment privilege against self-incrimination if called before the grand jury. Defendant twice appeared before the grand jury on March 5, 1992, and May 20, 1992. Defendant was advised of his rights to invoke the Fifth Amendment privilege against self-incrimination on both occasions, and he invoked the privilege on both occasions. At the second hearing on May 20, 1992, defendant was asked about a subpoena for audio and video tapes which the grand jury had earlier issued. Previously, the defendant had turned over some tapes to the grand jury and had indicated that he thought one more tape might exist. At this second grand jury appearance, he testified that the grand jury had all the tapes which existed. Defendant then invoked the Fifth Amendment privilege and refused to give any further testimony.

The mere "subpoenaing of the defendant before the grand jury is not per se a violation of his constitutional rights or a ground for dismissal of the indictment." *United States v. Bell,* 351 F.2d 868, 874 (6th Cir.1965), *cert. denied,* 383 U.S. 947, 86 S.Ct. 1200, 16 L.Ed.2d 210 (1966). Moreover, defendant was aware that he could assert his Fifth Amendment privilege during the grand jury proceedings, and he did so. Furthermore, the defendant's statement that he had turned over all the evidence subpoenaed by the grand jury was neither inculpatory nor exculpatory. Accordingly, this issue is meritless.

■ Defendant also asserts that the government used the testimony of Lisa Couch at trial even though the government knew that her testimony was highly suspect. Defendant had surreptitiously tape-recorded a conversation he had with Couch. The jury heard Couch's testimony and the tape. Further, defendant was acquitted of the count involving Lisa Couch.

■ Defendant next asserts that the government's conduct was outrageous because the government threatened, harassed, and intimidated potential witnesses in an attempt to affect their testimony. Along with his motion to dismiss the indictment on the ground of outrageous government conduct, defendant submitted several affidavits from potential witnesses. After reviewing the affidavits, the district court found that they did not support defendant's claim of outrageous governmental conduct. Moreover, despite his unsupported claim that the government attempted to coerce potential witnesses, defendant was able to present numerous witnesses at trial and to obtain acquittal on four of the charges against him. Thus, defendant's claim of outrageous governmental conduct was meritless.

■ Finally, defendant asserts that the government unlawfully intercepted telephone calls he made using his cordless telephone. Although the government claimed that it acted lawfully in intercepting the cordless telephone calls, it nevertheless agreed not to use the tape recordings of the cordless telephone conversations at trial. Thus, defendant's trial was not prejudiced by the government's interception of his cordless telephone calls.

### J.

■ Defendant argues that the district court's jury instructions were improper. Specifically, defendant asserts that the district court improperly instructed the jury on the issue of consent. The district court instructed the jury that

[f]or the physical contact to be unlawful, it must have been unauthorized and not due to the free and voluntary consent of the alleged victim. It is for you to determine whether any such conduct occurred by reason of uncoerced and voluntary consent.

J.A. 885. During its deliberations, the jury sent a note to the judge asking what role implied consent played in the defendant's willfully depriving the victims of their rights. Defendant then asked that a further instruction to the effect that consent is a complete defense to any assault, whether the consent is express or implied, be given to the jury.

The district court did not give this instruction, and defendant asserts that this was error.

"'The standard on appeal for a court's charge to the jury is whether the charge, taken as a whole, fairly and adequately submits the issues and applicable law to the jury.'" *United States v. Buckley*, 934 F.2d 84, 87 (6th Cir. 1991) (quoting *United States v. Martin*, 740 F.2d 1352, 1361 (6th Cir. 1984)).

In this case, the district court's jury instructions adequately submitted the issues and law to the jury. Moreover, the instructions on the issue of consent were correct, and the district court did not err in declining to give the instruction requested by the defendant. Further, "the trial judge is given substantial latitude in tailoring the [jury] instructions," and "neither party, including a criminal defendant, may insist upon any particular language." *United States v. Saussy*, 802 F.2d 849, 853 (6th Cir.1986) (quoting *United States v. James*, 576 F.2d 223, 226–27 (9th Cir.1978)), *cert. denied*, 480 U.S. 907, 107 S.Ct. 1352, 94 L.Ed.2d 522 (1987).

## K.

■ Defendant argues that the district court erred in enhancing his offense level by two levels for obstruction of justice under United States Sentencing Guideline ("U.S.S.G.") § 3C1.1. The district court found that the obstruction of justice enhancement was applicable because defendant had committed perjury at trial. Specifically, the district court stated:

> I am required to make a finding with respect to whether the defendant committed perjury relative to a material fact while testifying under oath in this case with willful intent to provide false testimony. Given the defendant's testimony at this trial and the testimony that was to the contrary, provided by the various victims in this case, with respect to those counts on which there was a verdict of guilty, I cannot make any finding by a preponderance of the evidence other than that the defendant testified under oath falsely with the willful intent to provide false testimony as to material issues or matters, and I so find.

I make that finding without direct reliance on the verdict of the jury in this case and based on my evaluation of the evidence. J.A. 947–48.

U.S.S.G. § 3C1.1 provides:

> If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels.

In *United States v. Dunnigan*, — U.S. —, —, 113 S.Ct. 1111, 1116, 122 L.Ed.2d 445 (1993), the Supreme Court stated that a "witness testifying under oath or affirmation" commits perjury "if [he] gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake or faulty memory." The Supreme Court further stated that at sentencing, if a defendant objects to a sentence enhancement for perjury under U.S.S.G. § 3C1.1 based upon his trial testimony, "a district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same, under the perjury definition we have set out." *Id.* at —, 113 S.Ct. at 1117. The Court further stated that in making its findings "it is preferable for a district court to address each element of the alleged perjury in a separate and clear finding. The district court's determination that enhancement is required is sufficient, however, if ... the court makes a finding of an obstruction or impediment of justice that encompasses all of the factual predicates for a finding of perjury." *Id.*

■ A district court retains discretion in deciding whether a defendant's actions constitute an obstruction of justice under the guidelines, and this court reviews the district court's decision under an abuse of discretion standard. *United States v. Medina*, 992 F.2d 573, 591 (6th Cir.1993), *cert. denied*, — U.S. —, 114 S.Ct. 1049, 127 L.Ed.2d 371 (1994). In deciding whether a defendant's testimony at a criminal trial constituted perjury, the district court may not rely on the jury's finding of guilt, but, rather, must make

findings of its own. *Mathews v. United States*, 11 F.3d 583, 587 (6th Cir.1993). However, once a district "court makes a finding that a defendant 'testified untruthfully as to a material fact while under oath,' the district court [has] no discretion under the Sentencing Guidelines in applying § 3C1.1." *United States v. Morgan*, 986 F.2d 151, 153 (6th Cir.1993) (per curiam) (quoting *United States v. Alvarez*, 927 F.2d 300, 303 (6th Cir.), cert. denied, 500 U.S. 945, 111 S.Ct. 2246, 114 L.Ed.2d 487 (1991)).

■ Defendant first argues that the district court failed to make proper findings to support the obstruction enhancement. In this case, the district court found that defendant testified falsely under oath with the willful intent to provide false testimony as to material matters. Further, the district court also explicitly stated that its conclusion was based upon its own evaluation of the evidence and not the jury's verdicts. Given the fact that defendant testified that none of the alleged sexual assaults occurred, the district court's finding of obstruction of justice was not an abuse of discretion. Defendant's testimony that none of the alleged assaults occurred clearly concerned a material matter, and since the testimony utterly contradicted the victims' testimony, it was clearly made with the intent to provide false testimony. Thus, the district court's finding of obstruction of justice "encompass[ed] all the factual predicates for a finding of perjury." *Dunnigan*, — U.S. at —, 113 S.Ct. at 1117. Therefore, the district court's finding of obstruction of justice comports with *Dunnigan*.

■ Second, defendant asserts that the district court erred in believing that it lacked the discretion not to apply the enhancement. However, once the district court made the required finding that the defendant had committed perjury, it was required to apply the enhancement under U.S.S.G. § 3C1.1.

**L.**

■ Defendant first argues that the district court erred in imposing a fine of $25,000. He asserts that the district court erred in imposing the fine because he did not have the funds to pay it.

U.S.S.G. § 5E1.2(a) requires courts to impose fines in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. In determining the amount of the fine, the court is to consider, among other things, "any evidence presented as to the defendant's ability to pay the fine (including the ability to pay over a period of time) in light of his earning capacity and financial resources." U.S.S.G. § 5E1.2(d)(2). A defendant has the burden of showing that he is unable to pay the fines imposed by the district court. *United States v. Vincent*, 20 F.3d 229, 240 (6th Cir.1994).

Although the presentence report noted that defendant had a negative net worth of $83,835, the presentence report also noted that defendant's conviction and removal from the bench would not result in his losing his state pension of approximately $1,500 to $1,800 per month. *Further, the presentence investigation report also noted that within the year prior to his conviction, defendant transferred a number of his properties to other persons.*

■ A district court's findings concerning a defendant's ability to pay are factual findings which are subject to a clearly erroneous standard of review. *United States v. Hickey*, 917 F.2d 901, 905 (6th Cir.1990). Based upon the record, and the fact that defendant will likely be receiving a substantial state pension even during his incarceration, the district court's finding that defendant could pay a $25,000 fine is not clearly erroneous.

■ Defendant also argues that the additional fine of $1,492 per month imposed for the cost of imprisonment, which is to be paid so long as defendant is receiving a pension, is unlawful because it is not authorized by the Sentencing Reform Act. Although U.S.S.G. § 5E1.2(i) provides for the imposition of a fine for the costs of incarceration, defendant urges this court to follow the holding of the Third Circuit in *United States v. Spiropoulos*, 976 F.2d 155 (3d Cir.1992). In *Spiropoulos*, the Third Circuit concluded that the Sentencing Reform Act does not authorize a fine pursuant to U.S.S.G. § 5E1.2(i) for the cost of imprisonment. *Id.* at 165.

■ However, defendant did not make this argument to the district court, and, thus, this court need not resolve the issue. *See United States v. Mondello,* 927 F.2d 1463, 1468 (9th Cir.1991) (Ninth Circuit refused to consider the issue of whether "the fine provisions of the Guidelines are contrary to statutory authority," where the argument was raised for the first time on appeal); *see also United States v. Carrozza,* 4 F.3d 70, 84 (1st Cir.1993) (where defendant did not raise issue concerning his cost of imprisonment fine before the district court, First Circuit would consider the issue only for plain error. Because the issue had resulted in conflicting decisions in other circuits, the district court's assessment of a cost of imprisonment fine is not plain error within the meaning of Fed. R.Crim.P. 52(b).), *cert. denied,* — U.S. —, 114 S.Ct. 1644, 128 L.Ed.2d 365 (1994).

Further, even if we were to consider the issue, the Third Circuit's decision in *Spiropoulos* is neither persuasive nor dispositive. The Seventh Circuit expressly rejected the Third Circuit's position in *United States v. Turner,* 998 F.2d 534 (7th Cir.), *cert. denied,* — U.S. —, 114 S.Ct. 639, 126 L.Ed.2d 598 (1993). Moreover, two other circuits had already reached a contrary decision prior to the decision in *Spiropoulos. See United States v. Hagmann,* 950 F.2d 175 (5th Cir.1991), *cert. denied,* — U.S. —, 113 S.Ct. 108, 121 L.Ed.2d 66 (1992); *United States v. Doyan,* 909 F.2d 412 (10th Cir. 1990). Accordingly, we agree with the Fifth, Seventh, and Tenth Circuits and hold that the district court did not err in either of the fines it imposed.

### M.

■ Defendant argues that the district court applied the wrong guideline in determining his offense level for the two felony counts, counts 6 and 7, which involved Vivian Archie. Defendant asserts that with respect to counts 6 and 7, the district court should have used U.S.S.G. § 2A3.4, Abusive Sexual Contact, rather than the guideline it used,

U.S.S.G. § 2A3.1, Criminal Sexual Abuse, to determine his offense level. Defendant asserts that U.S.S.G. § 2A3.1 is intended to apply to a crime of violence, and his assaults of Vivian Archie, counts 6 and 7, were not crimes of violence.

■ This court reviews "a district court's factual findings which underlie the application of a guideline provision for clear error." *United States v. Garner,* 940 F.2d 172, 174 (6th Cir.1991). However, whether the facts determined by the district court warrant the application of a particular guideline provision is a question of law which is reviewed de novo by this court. *Id.*

In this case, the district court found that 18 U.S.C. § 2241 was the underlying offense which most closely resembled the offense conduct in counts 6 and 7.[7] 18 U.S.C. § 2241(a)(1) defines aggravated sexual abuse, in relevant part, as "knowingly caus[ing] another person to engage in a sexual act ... by using force against that other person." The term "sexual act" as defined in 18 U.S.C. § 2245(2)(B) includes oral sex. U.S.S.G.App. A., the statutory index, states that U.S.S.G. § 2A3.1 applies to violations of 18 U.S.C. § 2241.

On the other hand, the statutory index states that U.S.S.G. § 2A3.4 applies to violations of 18 U.S.C. § 2244. 18 U.S.C. § 2244 defines abusive sexual contact in relevant part as "knowingly engag[ing] in or caus[ing] sexual contact with or by another person...." The term "sexual contact" is defined in 18 U.S.C. § 2245(3) as "mean[ing] the intentional touching, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh, or buttocks of any person with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person."

Based upon the testimony of Vivian Archie, upon which defendant was convicted, defendant's actions in twice forcing Archie to perform oral sex on him constituted aggra-

---

7. The district court was required to make this determination because U.S.S.G. § 2H1.4, the guideline provision applicable to violations of 18 U.S.C. § 242, the offense of conviction, stated that a defendant's base level is the greater of 10,

or 6 plus the offense level applicable to any underlying offense. Since the offense level for the underlying offense for counts 6 and 7 as determined from U.S.S.G. § 2A3.1 was 27, this resulted in a base offense level of 33.

vated sexual abuse under 18 U.S.C. § 2241(a)(1) and not abusive sexual contact under 18 U.S.C. § 2244(a)(1). Accordingly, the district court did not err in determining that U.S.S.G. § 2A3.1 applied to counts 6 and 7.

### N.

■ Defendant also argues that his sentence violated the Eighth Amendment because the total sentence imposed, 25 years, is disproportionate to the crimes committed. "[A]s a matter of principle ... a criminal sentence must be proportionate to the crime for which the defendant has been convicted." *Solem v. Helm,* 463 U.S. 277, 290, 103 S.Ct. 3001, 3009, 77 L.Ed.2d 637 (1983). However, "[r]eviewing courts ... should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes, as well as to the discretion that trial courts possess in sentencing convicted criminals." *Id.* Moreover, "[o]utside the context of capital punishment, *successful* challenges to the proportionality of particular sentences [will be] exceedingly rare." *Id.* at 289–90, 103 S.Ct. at 3009 (quoting *Rummel v. Estelle,* 445 U.S. 263, 272, 100 S.Ct. 1133, 1138, 63 L.Ed.2d 382 (1980)).

In *Harmelin v. Michigan,* 501 U.S. 957, 997, 111 S.Ct. 2680, 2702, 115 L.Ed.2d 836 (1991), the Supreme Court recognized that the Eighth Amendment "encompasses a narrow proportionality principle."[8] The plurality in *Harmelin* concluded that "the Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime." *Id.* at 1001, 111 S.Ct. at 2705 (quoting *Solem,* 463 U.S. at 288, 303, 103 S.Ct. at 3008, 3016). Consequently, the *Harmelin* plurality concluded that "intra- and inter-jurisdictional

analyses are appropriate only in the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality." *Id.* at 1005, 111 S.Ct. at 2707.

There is no inference of gross disproportionality between defendant's sentence and the crimes defendant committed. Defendant was' convicted of seven out of the eleven counts in the indictment. These seven counts involved sexual assaults on five women, two of which were felony counts involving defendant's physically forcing a woman to perform oral sex on him on two occasions, resulting in bodily injury to her. Further, in committing these crimes, defendant misused his power as a state judge to gain access to, as well as silence from, the victims, who were his employees, a worker in a juvenile program, or litigants before him. Thus, defendant's claim that his sentence of 25 years is so grossly disproportionate to the crime he committed as to suggest an Eighth Amendment violation has no merit.

### O.

■ Finally, defendant argues that the district court erred in denying his motion for a downward departure under U.S.S.G. § 5K2.0. He asserts that the district court should have departed downward because this is not a "heartland" type of case, but an "atypical case." Brief of Appellant at 48.[9]

This issue is not appealable. "This Court has held that when the sentencing range is properly computed, the district court is aware of its discretion to depart, and the sentence is not imposed in violation of law or as the result of an incorrect application of the Sentencing Guidelines, a failure to depart is not a cognizable basis for appeal." *United States v. Isom,* 992 F.2d 91, 94 (6th Cir.1993).

---

8. In *United States v. Hopper,* 941 F.2d 419, 422 (6th Cir.1991), this court concluded that the plurality opinion in *Harmelin* was binding on the Sixth Circuit.

9. In this case, the district court sentenced defendant to a sentence equal to the statutory maximum for the offenses of conviction, 25 years or 300 months. However, this sentence is actually less than the sentencing guideline range. Defen-

dant's total offense level of 41 and his criminal history category, category I, result in a sentencing guideline range of 324 to 405 months' incarceration. Nevertheless, the district court sentenced defendant below the guideline range only because of the statutory maximum, not because it found any factors warranting a downward departure.

### III.

For the reasons stated, the district court is AFFIRMED in all respects.

WELLFORD, Senior Circuit Judge, concurring.

I concur in Judge Milburn's thorough analysis of this case. I write separately to emphasize several aspects of this case that are troubling to this panel member. Despite the fact that Judge Lanier's actions, as determined by the jury, were reprehensible, especially offensive, and inexcusable on the part of a judge, I have still examined this record with special care because it is an unusual *criminal* proceeding. We have found no other reported § 242 prosecutions involving a state judge, and we have found no other criminal cases involving charges of molestation, unconsensual touching, and, in general, sexual harassment of female adults typical in § 1983 or Title VII civil cases. Yet, no victim had brought, at the time of trial, any civil claim or charge against this defendant, perhaps because of fear, embarrassment, or understandable reluctance.

My first concern relates to defendant's request for severance of the two felony charges involving Vivian Archie from the other misdemeanor offenses.[1] The overwhelming impact of this case upon former Judge Lanier were these two felony offenses in Counts 6 and 7. Combining the numerous other much less serious offenses (based on the penalty involved) with these two offenses (Counts 6 and 7), in my view, undoubtedly impacted unfavorably and adversely upon defendant Lanier. The government had to know in advance of the indictment that, as the majority puts it and the government admitted in its brief, the chief prosecuting witness, Archie, was far from being a "model citizen." Archie had admitted drug problems and concededly granted sexual favors to the doctor friend of defendant. (Evidence of her general reputation was properly precluded at trial except for testimony from a number of witnesses who deemed her a liar.) I consider it to have been a close question as to whether there should have been a severance of Counts 6 and 7. Evidence of improper and unlawful touching, exposure, fondling and the like doubtless made the defense of these felony counts more difficult.

My concern is heightened by what I believe was an improper curtailment of cross-examination of Vivian Archie regarding her drug use. If she had, in fact, been under the influence of drugs at or about the time of the encounters set out in Counts 6 and 7, I believe it may well have reflected upon her credibility.

Although this may be a first criminal prosecution of this type, the instructions given by the district judge made it clear that "an unjustified touching" had to constitute "physical abuse ... of a serious and substantial nature" involving "physical force, mental coercion, bodily injury or emotional damage which is shocking to one's conscience" to make out a constitutional violation. The district court made it clear that a great deal more than simple unwanted sexual touching must be proven to convict a state actor under § 242.

Most cases under § 242 have involved custodial situations—prison guards and officials, police or security officers, border guards, etc. The custody element is not present here and this absence has made this an unusual case.

Finally, I emphasize that there is a vast difference between a § 1983 civil prosecution of a defendant for unwanted sexual advances or harassment and a criminal prosecution under § 242, not merely based upon the different burden of proof. Willful and intentional criminal conduct, which amounts to that which shocks the conscience, is far different from that conduct which the civil plaintiff charging a § 1983 violation must demonstrate to make out a case. *See United States v. Bigham*, 812 F.2d 943, 948 (5th Cir.1987).

Despite these reservations, I concur in the affirmance under all the circumstances set out in Judge Milburn's comprehensive opinion.

---

1. The jury found defendant not guilty of the Count 10 felony offense involving Lisa Couch.