**VALUE BEHAVIORAL HEALTH, INC., Plaintiff,**

v.

**OHIO DEPARTMENT OF MENTAL HEALTH, et al., Defendants.**

No. C2–97–395.

United States District Court, S.D. Ohio.

May 30, 1997.

Charles H. Walker, Elizabeth Squeglia, Bricker & Eckler, Columbus, OH, Marcia Madsen, David F. Dowd, Miller & Chevalier,

Chartered, Washington, DC, Dot Powell–Woodson, House Counsel, Value Behavioral Health, Inc., for plaintiff.

Diane Weaver, John Williams, Assistant Attorneys General, Columbus, OH, Janice Franke, Staff Counsel, Dept. of Mental Health, Columbus, OH, for defendant Ohio Dept. of Mental Health.

Patrick Beatty, Assistant Attorney General, Columbus, OH, for defendant Ohio Dept. of Health and Human Services.

Suzanne Scrutton, Assistant Attorney General, Columbus, OH, for defendant Ohio Dept. of Alcohol and Drug Addiction Services.

James E. Arnold, Terry M. Miller, Douglas R. Matthews, Vorys, Sater, Seymour & Pease, Columbus, OH, for intervenor Ohio Behavioral Health Partnership, Inc.

### OPINION AND ORDER

SARGUS, District Judge.

Plaintiff Value Behavioral Health, Inc. ["plaintiff VBH"] initiated this action on April 8, 1997, seeking injunctive and declaratory relief under, *inter alia,* 42 U.S.C. § 1983, alleging that officials of the State of Ohio unlawfully awarded a contract for management of certain Medicaid behavioral health services to Ohio Behavioral Health Partnership ["OBHP"]. The second amended complaint names as defendants Michael F. Hogan, director of the Ohio Department of Mental Health ["ODMH"]; and Luceille Fleming, director of the Ohio Department of Alcohol and Drug Addictive Services ["ODADAS"]. On May 2, 1997, the Court issued an Order temporarily restraining defendants Hogan and Fleming from submitting the contract for final approval to the Ohio Controlling Board. OBHP was thereafter given leave to join in this action as an intervening defendant. Following the issuance of the Temporary Restraining Order, this Court scheduled the case, with the consent of the parties, for an expedited, final trial on the merits of the Complaint. Trial to the Court was held on May 20 and 21, 1997.[1]

---

1. The parties jointly moved to extend the effective date of the temporary restraining order to

The second amended complaint alleges that the State defendants violated VBH's rights under 42 U.S.C. § 1396, *et seq.*, and its implementing regulations, 45 C.F.R. Part 74, by unlawfully disclosing VBH's proposed price breakdown to OBHP, by permitting OBHP thereafter to modify its proposal, by denying VBH the same opportunity, and by awarding the proposed contract to OBHP. The second amended complaint further alleges that the State defendants violated 45 C.F.R. § 74.43 by, *inter alia*, treating offerors unfairly and awarding the contract based upon a noncompliant proposal which did not respond to the terms of the state's solicitation to bidders.

## I.

*Factual Background*

Medicaid is a cooperative federal-state program set forth in Title XIX of the Social Security Act. 42 U.S.C. § 1396, *et seq.* The program is designed to provide federal monies to the various states so that, in turn, the states may furnish medical care to indigent individuals. While states are not required to participate in the Medicaid program, to qualify for federal Medicaid funding, each participating state must submit to the Secretary of Health and Human Services ("HHS") a "plan for medical assistance" as required by 42 U.S.C. § 1396a(a).

State plans for medical assistance must contain a number of provisions which are set forth in 42 U.S.C. § 1396a(a)(1) through (62). One of those provisions requires that the state plan provide for payment of medical treatment rendered to a Medicaid recipient by any qualified physician, hospital, or other medical provider. 42 U.S.C. § 1396a(a)(23). The State of Ohio applied for a waiver of this specific requirement and sought permission from the Health Care Financing Administration ("HCFA"), an agency that is part of HHS, to create a managed care system involving a limited number of preselected medical providers. Pursuant to its authority under 42 U.S.C. § 1315(a), HCFA granted a waiver to the State of Ohio authorizing it, under certain conditions, to enter into a managed care system for behavioral health services in which, *inter alia*, certain individuals or groups would become the only providers eligible for payment with Medicaid dollars.

On November 4, 1996, ODMH and ODADAS issued a Request for Proposal ("RFP") as to the proposed contract by which a single private entity would establish behavioral health provider service groups, implement a transfer of services to such groups, coordinate behavioral health services to participants, and administer the entire claims process. In addition to establishing a managed care system, the successful bidder under the terms of the RFP would also cause the consolidation and coordination of behavioral health services currently being provided by three state agencies (ODMH, ODADAS and the Ohio Department of Human Services) as well as a large number of county and community based public and non-profit agencies.

The RFP set forth a method by which interested bidders would submit proposals by January 2, 1997. The RFP set forth specific criteria that a bidder was required to meet before any proposal would be evaluated and considered.

Three companies responded to the RFP, including the plaintiff VBH and intervenor, OBHP. After the proposals were submitted on January 2, 1997, the state agencies created review teams whose members made an initial evaluation of each company's submission. Scoring of each proposal was made by reference to a set of eighty-one preestablished questions to be answered and graded by each evaluator. The questions were intended to incorporate the criteria set forth in Section 8.3 of the RFP as to relative weight and importance of various factors as proposed by each potential vendor.

After the completion of this initial stage (identified as Phase One and Two in the RFP), on January 13, 1997, the state agencies mailed to each of the responding bidders requests for clarification. The answers of the intervenor, OBHP, to such requests are the basis for significant portions of the plaintiff's complaint. The state agencies sought clarification of the intervenors proposed rate

structure as to a charge under the category designated as "reinsurance."

The RFP instructed bidders to propose a rate structure which allocated certain costs of medical services by various categories and, further, specified the cost of administrative services to be provided by the potential vendor. The RFP specifically established the total amount that the state would pay to any vendor under the contract by using a fixed monthly fee of $11.91 payable to the vendor for each month for each person eligible for Medicaid coverage.[2]

The bidders were therefore not to compete as to total cost for providing the services sought by the state. The bidders were, however, required to list amounts to be spent under the pm/pm formula and allocate such funds as to various service categories and administrative costs.

The RFP also placed a cap on the potential profit available to the successful vendor. Under the category of Risk/Incentive Pool, a bidder was directed to set aside an amount not to exceed $1,500,000.[3] If the successful bidder paid out at least 96% and not more than 100% of the amounts budgeted for health care services,[4] the vendor could retain the $1.5 million as profit. If claims exceeded the contract amount, the $1.5 million was to be used as a risk pool and excess claims would be paid from these funds. Similarly, if penalties were payable in the event less than 96% of the budget for medical services was expended, the same $1.5 million would be used for penalty payments required to be paid by the terms of the RFP.

Significantly, any amounts allocated by a vendor under administrative costs which were not expended by the end of the year could be retained by the vendor. In contrast, any amounts budgeted for health care

services not expended during the year would be refunded to the state.

In the original submission of OBHP, the company listed under "administrative costs" the sum of $.36 pm/pm for "reinsurance." This charge equaled the sum of $5,364,000 according to the state's estimate as to the number and duration of Medicaid eligible participants.

In the Request for Clarification, OBHP was asked to explain the mechanics of its reinsurance proposal. OBHP thereupon responded that it did not intend to seek reinsurance, but was instead intending to self-insure. (PX 20, 07789, 07790). During the trial of this matter, much testimony was offered as to the differences and similarities of reinsurance and self-insurance. While both are methods designed to minimize a bidder's potential financial risk, only the self-insurance method includes the possibility that unexpended funds could be recouped by the self-insured bidder. In contrast, under a reinsurance arrangement, premiums are paid to a third party with no refund available. OBHP's response of January 20, 1997, recognized this distinction and included the following:

> As self-insurance, these funds will be treated in a manner similar to those we would have to obligate to a subcontracted insurer to cover the risk associated with the Transfer Benefit Program [sic], as such, we do not anticipate "refunding" those funds in the same way we would not be able to "refund" them had we expended them with a "third-party insurer." (PX 20, 07790).

OBHP clearly indicated to the state that it would not be purchasing reinsurance, but would instead self-insure to the extent of

---

2. The method described is abbreviated as pm/pm, meaning per month, per member. The state estimated roughly 14.9 million pm/pm's would be involved in each year for an estimated contract price of $177,459.00.

3. The RFP places great emphasis on the capping of profit. The RFP contains four pages of explanation as to the Risk/Performance Incentive Provisions, the only category from which profit could be received. (See PX 1, 00067–70). Assistant ODHM Director Maureen Corcoran em-

phasized that the profit capping feature was a critical method of pushing more dollars into treatment versus overhead or administrative costs.

4. The RFP was structured so as to provide a given level of health care. If the unsuccessful vendor implemented policies that caused a reduction in utilization of care, the vendor would incur a penalty if utilization dropped more than 4% of the amount budgeted for services.

$5,364,000. If this amount were not actually expended, the sum would not be refunded to the state.

After receipt of the answers to Requests for Clarification, the state agencies reevaluated the clarified proposals and scheduled on-site interviews. After forwarding its answer to the Requests for Clarification, no further written submissions were provided by OBHP to the state agencies, prior to February 3, 1997.

During the oral interviews, Maureen Corcoran, Assistant Director of ODMH, testified that the President of OBHP, Dr. Ronald I. Dozoretz, gave assurances that the $5,364,000 generated by the $.36 pm/pm charge for "self-insurance" would not be transferred back to OBHP if not expended on the contract. No documents were ever submitted by OBHP incorporating this purported significant change in its original proposal, as well as its response to the Request for Clarification. Without the alleged oral clarification described by Maureen Corcoran, the written proposal of OBHP could literally increase the capped potential profit of $1,500,000, under RFP Section 7.5.2, by an additional $5,364,000. The OBHP proposal included terms that exceeded the allotted potential profit amount by over 300%.

The RFP itself describes the last phase of the evaluation processes as including a review of the final proposal to insure that "all supporting documentation is attached." RFP Section 8.4. (PX 1, 00082). Bidders must submit twelve copies of their proposal. Section 3.3(6) (PX 1, 00026). All term and conditions must be included in the proposal. Section 3.3(6) (PX 1, 00026). Bidders are notified in bold type that any term in a resulting contract must be in writing. RFP Section 4.2, 4.3. (PX 1, 00034).

On February 3, 1997, a meeting was convened which included the Directors of ODMH and ODADAS, together with state employees and a retained consultant involved in the evaluation process. From the testimo-

ny of ODMH Director Hogan and ODADAS Director Fleming, it was clear that neither had been specifically briefed as to the issue of reinsurance versus self-insurance as proposed by OBHP. While Director Hogan was aware that OBHP's costs were "a problem," he had in his words, only "limited" discussions with Maureen Corcoran, whom he had placed in charge of the evaluation process.

At the February 3, 1997 meeting, both directors selected OBHP as the tentative selected bidder. During the same meeting, the two directors placed a call to Dr. Dozoretz, president of OBHP, and advised him that his company had been selected as the vendor under the RFP.

Following this phone call, several members of the evaluation team began planning for negotiations as to the final contract. Richard L. Tully, Jr., Chief of the Office of Fiscal Planning, ODMH, prepared a document captioned "Talking Points." (PX 28, 8328). The document states in part:

1. OBHP's administrative budget is excessive and its use of pm/pm payments for self-insurance is not in compliance with the RFP requirements . . .

Tully testified that the document was to be used in negotiations after the selection of OBHP had occurred. At trial, he also described his own document as an "overstatement."

During this same period, ODADAS Assistant Director Hernando Posado also expressed concern that the administrative costs of OBHP were high.[5] He did not express this concern to ODADAS Director Fleming. Posada was concerned that the Ohio Controlling Board, which ultimately would have to approve any final contract, would closely scrutinize any administrative costs.[6]

Less than two hours after the directors had notified OBHP that it had been selected, Maureen Corcoran placed a second call to OBHP's president. Both Posada and Tully participated in the call. Posada, Tully, and

---

5. At trial, Posada said the administrative costs were "high," while during a deposition taken the week prior, he described the same costs as "too high."

6. The Ohio Controlling Board is composed of the Ohio Director of Budget and Management, and six members of the Ohio Legislature. O.R.C. § 127.12. Certain contracts in excess of $50,000 must be approved by the Ohio Controlling Board.

Corcoran all testified that Corcoran advised Dr. Dozoretz that OBHP's administrative costs were too high. Ms. Corcoran specifically told Dr. Dozoretz that the total administrative cost could not exceed $.95 pm/pm.

The figure of $.95 pm/pm was the precise administrative cost bid by the plaintiff. Ms. Corcoran had previously reviewed the entire proposal of VBH as part of the evaluation process.

The following morning, Dr. Dozoretz faxed a revised rate schedule, Attachment III, to ODMH. (PX 27, 08325). The proposal eliminated any charge for reinsurance, thereby effectuating a projected $5,364,000 reduction in administrative costs. At the same time, $.11 pm/pm was added to other administrative categories, resulting in a net reduction of administrative costs of $.25 pm/pm.

Prior to this modification, OBHP's combined administrative costs set forth in its proposal were $1.21 pm/pm for a total of $18,029,000. VBH's combined administrative costs in its response to the RFP were $.95 pm/pm for a total $14,155,000.00. Prior to OBHP's February 4, 1987 modifications, the difference between the two proposals in terms of administrative costs was $3,864,-000.00. After OBHP submitted the modification explicitly proposed by Assistant Director Corcoran, the total administrative costs of OBHP and VBH were exactly the same.

According to Patricia A. Taylor, Vice President for OBHP, a second revision was requested by Maureen Corcoran on February 4, 1997. This revision added $.11 to categories ascribed to ODADAS spending, while deleting $.11 from ODMH spending. (DX 21). This second revision of February 4, 1997, was faxed at 1:20 p.m. on February 4, 1997.

No bidder other than OBHP was requested, or given the opportunity, to change its bid in response to a request from the state agencies. Only after receiving the two revisions from OBHP did the defendants then cause the unsuccessful bidders to be notified at approximately 4:00 p.m. on February 4, 1997, that they had not been selected.

Defendant Hogan testified that he would have approved the selection of OBHP even if the self-insurance charge of $5,364,000 which was impermissible under the terms of the RFP was not deleted. Hogan testified that OBHP was selected because of factors other than that of administrative costs.[7] Yet, just two hours after notifying OBHP that it had been selected, the Talking Points prepared by Tully and the substance of the follow up call placed by Corcoran involved issues pertaining only to administrative costs.

## II.

### A. Subject Matter Jurisdiction

The defendants and intervenor contend that, under the holding in *Seminole Tribe of Florida v. Florida,* ⎯ U.S. ⎯, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), this Court lacks subject matter jurisdiction. The plaintiff's complaint seeks declaratory and injunctive relief against state officials. Essentially, the plaintiff requests an injunction preventing the state from entering into a contract with OBHP.

The Eleventh Amendment to the Constitution states:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI. While the literal language of the Eleventh Amendment refers only to a suit brought by a citizen of one

---

7. The scoring of each submitted proposal was done under criteria set forth in Section 8.3 of the RFP. Under the criteria, only 15% of the analysis was weighted as to administrative cost issues. The Court notes that the state agencies deliberately minimized administrative cost in the evaluation process, but then showed great interest at the time of, and immediately after, notification to OBHP that it had been selected. Immediately after OBHP was notified, negotiations toward a final contract began only on issues involving administrative costs. While the state agencies have broad discretion in allocating weight to various factors involving bid evaluations, the conduct of the state officials as to immediate renegotiation of only administrative costs after selection of the vendor calls into question whether such costs were relatively unimportant in the evaluation process and involving only 15% of the points available in the scoring.

state against another state, the Supreme Court has held that the amendment also precludes a citizen from bringing a suit against his or her own state in federal court. *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890).

*Seminole Tribe of Florida, supra,* recognized a limited number of circumstances in which a private litigant may bring an action against a state in federal court. The first exception involves actions brought under the Fourteenth Amendment, or under statutes passed by Congress pursuant to Section 5 of the amendment.[8] The other exception involves an action brought under the *Ex parte Young* doctrine, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). The *Ex parte Young* exception permits a citizen to sue in federal court, a state official who is allegedly in violation or is about to violate federal law. The relief obtainable may only be that of an injunction.

The plaintiff has advanced two legal theories in its Second Amended Complaint. It first claims that the defendants have acted in violation of 42 U.S.C. § 1983, which states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Specifically, the plaintiff claims that the defendants have violated 42 U.S.C. § 1396a(a)(4) and 45 C.F.R. § 74.43, both of which are discussed more extensively below.

**8.** The Fourteenth Amendment states in part:

SECTION 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the law. SECTION

In *Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980), the Supreme Court held that 42 U.S.C. § 1983 authorizes suits for alleged violations of federal law as well as the Constitution.[9] As noted in this Court's opinion of May 2, 1997, in this case, the Supreme Court has not at this time reconciled the *Thibotot* and *Seminole* decisions. While *Seminole* clearly affirms the notion that states and state officials may be sued by individuals in federal court under statutes passed pursuant to the Fourteenth Amendment, it is unclear whether, after *Seminole,* claims arising under § 1983 must be grounded in the Fourteenth Amendment.

On April 21, 1997, the Supreme Court decided the case of *Blessing v. Freestone,* —— U.S. ——, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997). The case involved an action brought by an individual under 42 U.S.C. § 1983 against the Director of the Arizona Department of Economic Security. The complaint alleged a violation of Title IV–D of the Social Security Act, an action similar to that brought by the plaintiff herein under 42 U.S.C. § 1396a, which is Title XIX of the Social Security Act.

The Supreme Court reviewed various provisions of Title IV–D and unanimously determined that while portions of the Act were too general to give rise to individual rights enforceable under 42 U.S.C. § 1983, other provisions may be sufficiently specific to create an actionable statutory right. The *Blessing* decision cites with approval the case of *Maine v. Thiboutot, supra.* In a separate portion of the opinion, the Supreme Court refused the request of the state defendant to overrule *Thiboutot* on the basis of the *Seminole* decision. The Supreme Court declined to address the state's invitation, finding that the question was not presented in the petition for certiorari.

5. The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.

**9.** *Thiboutot* also holds that a statute used as a basis for a § 1983 action must be specific enough to create enforceable rights. Further, Congress must not have foreclosed a § 1983 action in the language of the statute used as the basis for the claim.

■ Since the Supreme Court has expressly cited with approval the *Thiboutot* case in the *Blessing* decision of last month, this Court is duty bound to follow the holding. Further, while the Supreme Court declined the state defendant's request to overturn *Thiboutot* in light of *Seminole,* the issue in *Seminole* is that of the subject matter jurisdiction. Regardless of whether a party raises the question in a timely fashion, a court may not through a party's default expand its subject matter jurisdiction and an appellate court may raise such issue on its own motion. *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982).

■ While the question of whether 42 U.S.C. § 1396a provides a legal basis for a private party's cause of action or lawsuit as discussed below, the Court at this juncture concludes that it has subject matter jurisdiction over an alleged violation by the defendants of 42 U.S.C. § 1983 and 42 U.S.C. § 1396a.

At the Court's direction, plaintiff filed a Second Amended Complaint naming both defendants in both individual and official capacities. All parties agree that, under *Will v. Michigan Dept. of State Police,* 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989), the defendants may only be named in an official capacity when the relief sought is limited to that of an injunction. Therefore, the defendants are DISMISSED in their individual capacities.

The decision in *Seminole* also expressly recognized *Ex parte Young* as a second exception to the general rule that states are immune from private actions filed in federal courts without their consent. In *Seminole,* the Supreme Court reaffirmed "federal jurisdiction over a suit against a state official when that suit seeks only prospective injunctive relief in order to end a continuing violation of state law." *Seminole Tribe of Florida,* —— U.S. at ——, 116 S.Ct. at 1132.

■ In this case, the plaintiff also asserts that the injunctive relief requested is authorized by *Ex parte Young.* The plaintiff alleges that the defendants are in violation of federal law, specifically 42 U.S.C. § 1396a and 45 C.F.R. § 74.43, and such violation will continue unless enjoined.[10] The defendants are the Directors of two state agencies authorized to administer the Medicaid program with respect to the behavioral health services described in the RFP.

The defendants and intervenor correctly point out that a federal court may not apply the *Ex parte Young* doctrine to prevent a violation of state law. In its Order of May 2, 1997, this Court dismissed, *sua sponte,* all of the state claims asserted by the plaintiff.

The defendants and intervenor further argue that *Seminole* limited *Ex parte Young* from application to circumstances which would in essence enjoin or compel action by a state legislature, or the state itself. (Defendant's Trial Memorandum Regarding Jurisdiction, pp. 15–16.) This argument ignores the fact that legislation is not necessary for the state to enter into a contract with OBHP. While the Controlling Board is made up in part of members of the General Assembly, only six of the one hundred and thirty-two members of the Ohio Legislature sit on the Controlling Board. Binding action on the part of the Controlling Board does not require a vote of the Legislature. The Controlling Board acts in an executive function insofar as it approves state contracts. Further, the Controlling Board functions to approve contracts tentatively entered into by state agencies and directors, and does not, on its own authority, negotiate agreements with vendors. Ohio Rev.Code § 127.16.

The relief sought by the plaintiff against the two defendants, both of whom head state agencies, sets forth a valid claim under *Ex parte Young* over which, this Court concludes, it has jurisdiction.

**B. Application of Federal Law**

■ Having determined that subject matter jurisdiction exists, the Court turns to the more difficult question of whether the statute and regulations allegedly violated by the defendants are federal rights enforceable by

---

**10.** The following analysis assumes that 42 U.S.C. § 1396a and 45 C.F.R. § 74.43 are specific enough to be judicially enforced. That issue is discussed below.

private action. While the two bases for subject matter jurisdiction are separate, those being 42 U.S.C. § 1983 and the *Ex parte Young* doctrine, the question of whether 42 U.S.C. § 1396a and 45 C.F.R. § 74.43 are specific enough to warrant judicial enforcement raise issues common to both.

As previously noted, Title XIX of the Social Security Act, identified as 42 U.S.C. § 1396, *et seq.*, established the Medicaid program as a joint federal-state program. Title 42 U.S.C. § 1396a requires participating states to promulgate and follow a plan, which must include an extensive number of provisions set forth in 42 U.S.C. § 1396a(a)(1) through (62).

The plaintiff claims that the defendants have violated 42 U.S.C. § 1396a(a)(4) and 45 C.F.R. § 74.43. 42 U.S.C. § 1396a(a) states:

(a) A State plan for medical assistance must—

. . .

(4) provide (A) such methods of administration . . . .as are found by the Secretary [of HHS] to be necessary for the proper and efficient operation of the plan.

The Secretary has made certain regulations applicable to states receiving Medicaid funds. 45 C.F.R. Part 74. Under these regulations, states must comply with certain standards, pertaining to the expenditure of federal Medicaid monies. 45 C.F.R. § 74.43, states:

All procurement transactions shall be conducted in a manner to provide, to the maximum extent practical, open and free competition . . . Awards shall be made to the bidder or offeror whose bid or offer is responsive to the solicitation and is most advantageous to the recipient, price, quality and other factors considered. Solicitations shall clearly set forth all requirements that the bidder or offeror shall fulfill in order for the bid or offer to be evaluated by the recipient.

The question of whether specific provisions of 42 U.S.C. § 1396a and other provisions of state plans under the Social Security Act create private rights of action against state officials has received significant attention from the Supreme Court. In *Wilder v. Virginia Hospital Association,* 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990), an association of hospitals brought a similar action under 42 U.S.C. § 1983 and 42 U.S.C. § 1396a(a)(13) alleging that the state Medicaid plan created a substantive federal right by requiring states to pay medical providers "reasonable and adequate" rates to insure "efficient and economically operated facilities."

The hospitals sued the Governor of Virginia and contended that the state's reimbursement levels were unreasonable and inadequate to meet the economically and efficiently incurred costs of providing care to Medicaid patients confined to a hospital. The Supreme Court noted that the statute "does not define those terms, and the Secretary has declined to adopt a national standard ..." *Wilder,* 496 U.S. at 506, 110 S.Ct. at 2516.

The Supreme Court held that, under § 1983, a right of legal action by a private party against a state official for an alleged violation of one or more provisions of 42 U.S.C. § 1396a arises if several tests are met. The plaintiff must establish that the section "creates 'a federal right' that is enforceable under § 1983. Such an inquiry turns on whether 'the provision in question was intended to benefit the putative plaintiff.' " *Wilder* at 509, 110 S.Ct. at 2517 (citations omitted). If so, the provision provides the basis for a § 1983 action unless it expresses only a Congressional preference, rather than a binding obligation.

Thereafter, in 1992, the Supreme Court decided the case of *Suter v. Artist M.,* 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992). The Court found that the Adoption Assistance and Child Welfare Act, a part of the Social Security Act which also required the promulgation of state plans, did not create the basis for a private cause of action.

Congress thereafter enacted 42 U.S.C. § 1320a–2, which states:

In an action brought to enforce a provision of this chapter, such provision is not to be deemed unenforceable because of its inclusion in a section of this chapter requiring a State plan or specifying the required contents of a State plan. This section is not

intended to limit or expand the grounds for determining the availability of private actions to enforce State plan requirements other than by overturning any such grounds applied in *Suter v. Artist M.*, 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992), but not applied in prior Supreme Court decisions respecting such enforceability; provided, however, that this section is not intended to alter the holding in *Suter v. Artist M.* that section 671(a)(15) of this title is not enforceable in a private right of action.

Congress may, of course, create or eliminate private claims arising under federal statutes. The *Wilder* case was decided without clear knowledge of whether Congress intended to create the basis for causes of action or lawsuits by private parties as to alleged violations of state plans, such as those implementing Medicaid. Subsequent to the *Wilder* case, by enacting 42 U.S.C. § 1320a–2, Congress has made clear that the requirements of such plans may be the basis for private-party claims and lawsuits.

The recent case of *Blessing v. Freestone*, — U.S. ——, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997) further explains the holding in *Wilder*. As noted, the plaintiffs in *Blessing* sued the Director of the Arizona Department of Economic Security for her alleged failure to insure that the State of Arizona complied with the requirements of the state plan under Title IV–D of the Social Security Act, 42 U.S.C. §§ 651–669b, relating to the collection of child support.

While citing *Wilder* with approval, the Supreme Court reiterated a three part test to determine whether a violation of a state plan provision gives rise to a private cause of action. The Court stated:

> "First, Congress must have intended that the provision in question benefit the plaintiff. ... Second, the plaintiff must demonstrate that the right asserted is not 'so vague or amorphous' that its enforcement would strain judicial competence. .... Third, the statute must unambiguously impose a binding obligation on the state." (citations omitted).

*Blessing*, — U.S. at ——, 117 S.Ct. at 1359.

While the *Blessing* case did not involve a question relating to the first issue, the Court reviewed several provisions of Title IV–D which illustrate the second and third criteria. Title IV–D requires a state to meet certain standards in order to be in "substantial compliance" and eligible for federal funds. These standards include a requirement that it provide certain services in 75% or more of the cases referred. The Supreme Court found that this type of standard does not require the state to guarantee that all covered persons actually receive such services and cannot be the basis for a private cause of action.

In contrast, Title IV–D requires the state to attempt to collect child support from absent parents whose children are receiving Aid to Families with Dependent Children ("AFDC"). If funds were recovered under the then-existing law, the first $50 must be paid by the public agency to the residential or custodial parent. According to the Supreme Court, the agencies failure to do so, as required under Title IV–D, gives rise to a private cause of action under § 1983 on the part of the custodial parent.

Before this Court can apply the three-part *Wilder* and *Blessing* test, it must first address the question of whether such test, and in essence the entire § 1983 claim, must rest solely on the statute, 42 U.S.C. § 1396a(a)(4), or may also be based on more specific language found in 45 C.F.R. § 74.43. The Court directed the parties to brief this issue and each has submitted post-trial memoranda on this question.

The Supreme Court addressed this issue in *Wright v. City of Roanoke*, 479 U.S. 418, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987). The statute in question required that the Department of Housing and Urban Development charge for rent only a certain portion of tenants' income. While the statute limited such caps to rent, HUD regulations also required that a public housing authority charge only a "reasonable amount" for rent and utilities. The Supreme Court held that:

> The regulations, however, defining the statutory concept of "rent" as including utilities, have the force of law ..., they specifically set out guidelines that the

PHA's [public housing authorities] were to follow in establishing utility allowances.

*Id.* at 431, 107 S.Ct. at 774. The Supreme Court recognized that the regulations were enforceable under a private action brought pursuant to § 1983.

Moreover, in *Loschiavo v. City of Dearborn*, 33 F.3d 548 (6th Cir.1994), the Court of Appeals for the 6th Circuit addressed the same issue. The statute and regulations at issue involved a city's right to regulate the size and location of satellite dishes. While Congress gave to the FCC under the 1984 Cable Communications Act, 47 U.S.C. § 605(a), the power to promote the growth of the satellite television industry, the statutes themselves make no reference to state or local laws restricting the installation of satellite dishes. The FCC subsequently used its rule making authority under the statute to promulgate the following:

State and local zoning or other regulations that differentiate between satellite receive-only antennas and other types of antenna facilities are preempted unless such regulations:

(a) Have a reasonable and clearly defined health, safety or aesthetic objective; and

(b) Do not operate to impose unreasonable limitations on, or prevent, reception of satellite delivered signals by receive-only antennas or to impose costs on the users of such antennas that are excessive in light of the purchase and installation cost of the equipment.

47 C.F.R. § 25.104.

The Court of Appeals found that those regulations provided the basis for a private cause of action under § 1983, notwithstanding the fact that the statutes themselves did not contain sufficient specificity for a court to enforce. Such specificity could, however, be found in the agency's regulations. The Sixth Circuit concluded that:

As federal regulations have the force of law, they likewise may create enforceable rights ...

*Loschiavo,* at 551. Other cases have also held that federal regulations may provide the basis for a § 1983 suit. *See e.g., West Virginia University Hospitals v. Casey,* 885 F.2d 11 (3rd Cir.1989); *Samuels v. District of Columbia,* 770 F.2d 184 (D.C.Cir.1985). The same view was expressed by Judge George C. Smith of this Court in the well-reasoned decision of *Martin v. Voinovich,* 840 F.Supp. 1175 (S.D.Ohio 1993).

The Court concludes that it is bound by the holdings in *Loschiavo* and *Wright* insofar as the plaintiff's claim under § 1983 may include consideration of both 42 U.S.C. § 1396a(a)(4) and 45 C.F.R. § 74.43.[11]

In applying the *Wilder* and *Blessing* standards to a Section 1983 claim premised upon 42 U.S.C. § 1396a(a)(4) and 45 C.F.R. § 74.43, the Court has very little case law to aid in its analysis. The parties have not cited to the Court, nor has the Court found, a single case under 42 U.S.C. § 1396a(a) and 45 C.F.R. § 74.43 in which an unsuccessful bidder has challenged the award of a tentative contract using Medicaid funding.

Several cases have interpreted 42 U.S.C. § 1396a(a)(4), although such cases have not involved potential vendors. *See Methodist Hospitals v. Indiana Family and Social Services Administration,* 860 F.Supp. 1309 (N.D.Ind.1994); *Harris v. James,* 896 F.Supp. 1120 (M.D.Ala.1995); *Bock Associates v. Chronister,* 951 F. Supp. 969 (D.Kansas 1996). All of these cases involved the application of the *Wilder* analysis. In the first two cases, District Courts found valid causes of action under 42 U.S.C. § 1396a(a)(4), while in the second two, a contrary result was reached. Since the three part test under *Wilder* involves specific consideration of the type of plaintiff and the regulation at issue, these cases, which do not

---

**11.** Intervenor argues that 45 C.F.R. § 74.43 is not promulgated pursuant to 42 U.S.C. § 1396a and, for that reason, should not be considered. The intervenor concedes, however, that 45 C.F.R. § 74.43 applies to the State of Ohio with respect to the Medicaid program. The regulations cover

more than just Medicaid programs. The fact that the Secretary of HHS has elected to adopt uniform standards applicable to a variety of progress does not, in the Court's view, minimize or eliminate their application in this case.

involve unsuccessful vendors or 45 C.F.R. § 74.43, are of little assistance.

The first prong of the *Wilder* and *Blessing* standard requires the plaintiff to prove that it is an intended beneficiary of the statute and regulations. Whether unsuccessful vendors are also beneficiaries of the regulation presents a question of first impression. The regulations at issue impose at least three obligations relevant to this case:

(1) Open and free competition for all procurement transactions;

(2) Awards only to bidders whose bids are responsive to the state's solicitation;

(3) Solicitations for bids including all requirements that the bidder shall fulfill.

Without question, these requirements are primarily imposed to protect tax dollars. The primary beneficiaries are therefore the federal and state governments. Further, by use of such contracting procedures, state governments also have more dollars to spend on real services, making Medicaid recipients beneficiaries of the regulation.

A statute and regulation may have more than one class of intended beneficiaries. In *Wilder*, the plaintiffs were an association of hospitals challenging a state's administration of the Medicaid program. The statute in question required reimbursement to hospitals of amounts which were "reasonable and adequate" to meet the costs of "efficiently and economically operated facilities." 42 U.S.C. § 1396a(a)(13)(A). This provision has more than one intended beneficiary. If hospitals were not adequately reimbursed, Medicaid recipients could at some point be denied hospital care, rendering such recipients beneficiaries of the provision. The Supreme Court also found that hospitals were intended beneficiaries of the same statutory provision.

In *Rehabilitation Association of Virginia v. Kozlowski*, 42 F.3d 1444 (4th Cir.1994), the Court of Appeals found that providers of rehabilitative services were beneficiaries of 42 U.S.C. § 1396a(a)(10)(E), even though such providers were to be paid by long term care facilities, rather than to receive direct payment. The Court recognized that the providers had standing to challenge the state's administration of the statute provision.

The same result was reached in *Maryland Psychiatric Society v. Wasserman*, 102 F.3d 717 (4th Cir.1996). This case involved 42 U.S.C. § 1396a(a)(10)(E)(i) requiring payment of portions of the cost for outpatient psychiatric services. The Court found that the Maryland Psychiatric Society represented a group of psychiatrists who were one of the groups intended to be benefited by the statute.

Several District Courts also have held that providers of medical services were the intended beneficiaries of various provisions of 42 U.S.C. § 1396a. See *Pressley Ridge Schools v. Stottlemyer*, 947 F.Supp. 929 (S.D.West Va.1996); *Methodist Hospitals, Inc. v. Indiana Family and Social Services Administration*, supra; *Harris v. James*, supra.[12]

The Court recognizes that the rationale for permitting a private action by providers of medical services is not completely analogous to the issues involved in private actions by unsuccessful bidders. Nonetheless, there are a number of similarities. First, while the statute and regulation in question are directed only at the states, the Supreme Court and Congress itself have determined that the various provisions, if specific enough for judicial enforcement, create enforceable rights in third parties. Both providers and bidders are third parties whose financial interests are protected by statutes and regulations under 42 U.S.C. § 1396a(a)(4).

**12.** Intervenors cite two non-Medicaid cases, *Big Country Foods v. Anchorage Board of Education*, 952 F.2d 1173 (9th Cir.1992) and *Sowell's Meats and Services v. McSwain*, 788 F.2d 226 (4th Cir. 1986), for the proposition that the use of federal funds by states or local government does not confer a cause of action or standing upon a disappointed bidder to sue under similar federal binding regulations. The Court finds that in 42 U.S.C. § 1320a–2, Congress has explicitly sanctioned private causes of action, under appropriate *Wilder* standards, for violations of state plans under the Social Security Act, which includes Medicaid. Neither of those two cases involves 42 U.S.C. § 1320a–2, the Social Security Act, or the *Wilder* analysis.

Second, both Congress and the Supreme Court have viewed private causes of action as a method by which enforcement of the required state plans may be achieved. In *Wilder*, the Supreme Court viewed Congressional action as indicating a reluctance to rely solely on enforcement by HHS and, instead, an intent that private suits be available to achieve compliance. *Wilder*, 496 U.S. at 516–17, 110 S.Ct. at 2521–22.

To the extent that private suits by medical providers constitute an effective method of insuring compliance with state Medicaid plans, the same can be said for private suits by unsuccessful bidders under appropriate limitations. Just as providers of medical services have the greatest, if not the only, financial interest in insuring that federal law requiring adequate compensation is followed, so too do bidders have the financial interest to see that federal laws regarding bidding be followed.

The Court concludes that unsuccessful vendors who are deprived of a Medicaid contract due to alleged violations of 42 U.S.C. § 1396a(a)(4) and 45 C.F.R. § 74.43 are intended beneficiaries of the statute and regulations, subject to limitations described below. Under *Wilder*, and *Blessing*, the Court must next address whether the right asserted by the plaintiff is not vague or amorphous and is judicially enforceable. Section 45 C.F.R. § 74.43 contains, in the Court's view, certain minimum standards which, while conferring on the states certain latitude, create a base level of conduct as to the awarding of contracts.

Specifically, the regulation requires that states comply with at least three standards at issue in this case.

(1) All procurement transactions shall be conducted in a manner to provide to the maximum extent practical, open and free competition.

(2) Awards shall be made to the bidder or offeror whose bid or offer is responsive to the solicitation. . . .

(3) Solicitations shall clearly set forth all requirements that the bidder or offeror shall fulfill in order for the bid or offer to be evaluated by the recipient.

45 C.F.R. § 74.43.

With reference to the first requirement of § 74.43, the Court finds that, while mandatory compliance is required, a state is free to select from a variety of bidding procedures so long as the process is "open and free." For example, a state may choose a formal process of contract award to the lowest and best contractor through advertisement and sealed bids. Alternatively, states could provide a far less formal procedure, which would involve direct solicitation of only potential vendors in a given trade with the ultimate vendor selected after informal price comparisons.

The benchmark requirement, however, is that the process be "open and fair." While the state is free to select from a wide range of bidding methods, it may not select a process that does not give a fair and open chance to qualified bidders or a process that provides advantages or information to one bidder without according the same to all bidders. As the Supreme Court explained in *Wilder*:

"While there may be a range of reasonable rates, there certainly are some rates outside that range that no state could ever find to be reasonable and adequate under the [Medicaid] Act ... such an inquiry is well within the competence of the judiciary."

*Wilder*, 496 U.S. at 519–20, 110 S.Ct. at 2523.

It is not for a federal court to limit a state's discretion as to selecting a particular procurement policy, so long as such method is "open and free." An aggrieved plaintiff bears a heavy burden of proof, necessary to overcome the deference owed to a state, when it is claimed that the bidding process was not "open and free." Nonetheless, if such discretion is exercised by state officials in a manner that clearly negates "open and free competition," a federal court is not left without an enforceable standard but instead can look to the plain meaning of the term. Because of the wide range of items to be purchased, and the latitude available to the states, the term "open and free" is necessarily general. Nonetheless, the term requires

at a minimum that (a) bidders be treated equally, (b) the same rules apply to all bidders, and (c) potential bidders know the terms of the competition.

The two other mandatory standards set forth in 45 C.F.R. § 74.43 and described above are even more specific. The regulation requires that "Award shall be made to the bidder or offeror whose bid or offer is responsive to the solicitation ..." By these terms, a bidder must submit an offer or bid which conforms in all material respects to the state's solicitation for bid.

▬▬ Further, the regulation requires the state to include in its solicitation all requirements that a bidder must fulfill in order for its bid to be considered. While again according the states great latitude, this provision requires that, at a minimum, the states must expressly set forth all of the important factors involved in a potential contract so that bidders will be able to fairly understand the precise type of product or service being solicited by the state. The state must not accept a bid or offer which fails in a material way to meet the requirements of the solicitation.

The Court finds that all three requirements of 45 C.F.R. § 74.43 are judicially enforceable. While states are given wide latitude in selecting and applying bidding procedures, the regulation establishes clear, minimum standards.

The Court also finds that 42 U.S.C. § 1396a(a)(4) and 45 C.F.R. § 74.43 impose unambiguous, binding obligations on the state, as required under the *Wilder* analysis. Title 42 U.S.C. § 1936a(c) requires that a state plan "must ... (a)(4) provide (A) such methods of administration ... as are found by the Secretary to be necessary for the proper and efficient operation of the plan." 45 C.F.R. § 74.43 also includes affirmative, binding language, which tells the states that they "shall" follow each of the three standards set forth above.

The Court therefore concludes that the plaintiff has met its burden under *Wilder*, and that 42 U.S.C. § 1936a(a)(4) and 45 C.F.R. § 74.43 create federal rights upon which the plaintiff may maintain a private cause of action under both § 1983 and *Ex parte Young*.

Before leaving this portion of the analysis, the Court notes that the requirements set forth in 45 C.F.R. § 74.43, which are essentially minimum standards for a fair bidding process, are strikingly similar to statutory requirements adopted by the State of Ohio. Ohio Revised Code § 125.071 uses similar terminology to that adopted by the Secretary of HHS.

While 45 C.F.R. § 74.43 requires "open and free competition," O.R.C. § 125.071 uses the term "fair and equal treatment" of bidders. Section 125.071(D) specifically requires that

offerors shall be accorded fair and equal treatment with respect to any opportunity for discussion regarding any clarification, correction, or revision of proposals. No disclosure of any information derived from proposals submitted by competing offerors shall occur when discussions are conducted.

Ohio Rev.Code § 125.071(D). The same statute requires "fair and impartial evaluation" of proposals.

While this Court has, on its own motion, ruled that claims arising under state law may not be asserted in federal court against state officers, the state statutes previously referenced provide *less* discretion to the defendants than do 42 U.S.C. § 1396a(a)(4) and 45 C.F.R. § 74.43. Plaintiff alleges that the defendants selected a bidder that did not comply with the mandatory bidding requirements, that the state officials unlawfully permitted the intervenor and no other bidder to change its bid, and that the defendants improperly disclosed to the successful vendor bidding information relating to the plaintiff's offer. As discussed below, if true, all of these accusations violate specific provisions of state law, as well as 45 C.F.R. § 74.43.

The state defendants have asserted that, if the plaintiffs prevail "the State would be unduly restricted in its policy choices" and "deprived of significant policy options." Defendants Trial Memorandum Regarding Jurisdiction, p. 19. Yet, the plaintiff has asserted claims under federal law, which actually

impose fewer constraints on state contracting than does state law. As much as the state defendants would like to cast this case in the broad issue of the federal and state relationship, the state, by statute, imposes greater limits on the discretion given to the defendants than do the federal statute and regulations.

### Abstention

■ Both the defendants and intervenor have asserted that this Court should abstain from deciding this case under the doctrine set forth in *Burford v. Sun Oil Company*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). The *Burford* doctrine applies if a federal court's assertion of jurisdiction would interfere with a state agency, necessitate the resolution of state law issues, and disrupt state efforts to establish a coherent policy as to a matter of public concern.

■ The federal courts are "bound to proceed to judgment" and "cannot abdicate their authority or duty in any case in favor of another jurisdiction." *New Orleans Public Service v. Council of New Orleans*, 491 U.S. 350, 358, 109 S.Ct. 2506, 2512–2513, 105 L.Ed.2d 298 (1989). While federal courts may abstain from exercising jurisdiction, abstention is the exception and not the rule. *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976).

The defendants and intervenor cite the case of *Coalition for Health Concern v. LWD, Inc.*, 60 F.3d 1188 (6th Cir.1995) in support of their position that this Court should abstain. In that case, environmental groups sought judicial relief against a hazardous waste disposal facility. The same plaintiffs had previously sought to persuade state authorities, which had been given permitting and regulatory authority under the federal Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), that LWD should be denied a license to operate the facility. The plaintiffs subsequently abandoned their state administrative appeals and instead sought relief in federal court.

The Sixth Circuit found that if the federal court exercised jurisdiction, the State of Kentucky would be unable to effectively maintain an administrative scheme and review process governing the issuance of permits for hazardous waste facilities. The statutes in question simultaneously authorized state operated regulatory and administrative schemes and private rights of action under CERCLA.

■ By contrast, there is no state administrative procedure in the instant matter which would cause the type of interference with state authority described in the case of *Coalition for Health Concern v. LWD, Inc.* Moreover, this Court has dismissed on its own motion any claims arising under state law. The only issues before the Court arise under federal law.

A similar argument for abstention was made in *Virginia Hospital Association v. Baliles*, 868 F.2d 653 (4th Cir.1989), affirmed *sub. nom., Wilder v. Virginia Hospital Association, supra*. The Fourth Circuit Court of Appeals found:

> The district court found that the Virginia [Medicaid] plan was not the sort of comprehensive regulatory system it was bound to respect through abstention. The court also found that VHA [Virginia Hospital Association] could not have prosecuted it's federal claims through the administrative appeals apparatus, and that the Medicaid Act revealed Medicaid to be the subject of both state and federal concern ... In short, the district court found little that dovetailed with the *Burford* rationale for abstention. We think this was fairly plainly correct.

*Baliles* at 665.

The Court concludes that abstention would be inappropriate and the invitation to abstain is declined.

### III.

### Analysis of the Facts and Applicable Law

The Court now turns to an analysis of the facts in relation to the law as previously set forth.[13] In chronological order, plaintiff al-

---

13. The plaintiff conceded at trial that 45 C.F.R.

Part 74 does not require the various states to

leges that the defendants engaged in three violations of 42 U.S.C. § 1396a(a)(4) and 45 C.F.R. § 74.43. Specifically these claims are:

(1) The bid submitted by OBHP did not contain a limit on potential profit, as required by the Request for Proposal, rendering such bid unresponsive to the solicitation and therefore ineligible for consideration.

(2) Only one bidder, OBHP, was allowed to materially change its proposal after the cut off date for submission of final proposals.

(3) State officials improperly disclosed to OBHP the administrative costs bid by the plaintiff and then allowed OBHP to change its costs to the precise amount bid by the plaintiff.

■■■ With respect to the first claim, plaintiff asserts that the State's solicitation for bids contained a number of material specific requirements as to the bids which could be considered. While couched in rather wooden terms, the State's solicitation in the form of an RFP quite specifically limited the potential profit to a vendor to the sum of $1,500,-000. Any profit that a vendor could earn had to come from the "Risk/Performance Incentive Pool," described in detail in Plaintiff's Exhibit 1, at 00066 to 00070.

Section 7.5.1.4 of the RFP required that the allowable total amount includable in the Risk Performance Incentive Pool was "not to exceed $1,500,000." Def. Ex., 00067. Several state officials testified as to the importance of such profit cap, including ODMH Director Hogan (Trial Trans. 2–75) and ODMH Assistant Director Corcoran (TR. 2–108, 112, 117). Corcoran was specific in emphasizing the importance to the state of continued monitoring to insure that no excess profits were realized by the successful vendor.

The original response by OBHP to the State's Request for Proposal included a $.36 pm/pm reinsurance charge amounting to an annual sum of $5,364,000.00. As an administrative cost, rather than a cost for medical services, this amount was not refundable to the state if not spent by OBHP during the contract term.

State officials were unsure as to the method by which OBHP would spend the $5,364,-000 designated as reinsurance. In a written request for clarification, OBHP was asked by the state to describe the mechanics of its self-insurance proposal. OBHP responded that it did not intend to purchase reinsurance, but would instead use such funds as self-insurance. (PX 20, 07790). More specifically, OBHP informed the state that any surplus remaining in the self-insurance fluid would not be refundable to the state.

The terms of the State's own RFP prohibit any such self-insurance fund which could cause a refund to the vendor in the form of profit. The carefully crafted extensive designed Risk/Incentive Pool with a cap of $1,500,000 in profit is rendered meaningless by a self-insurance provision which would more than triple the amount of potential profit.

The testimony of ODMH Director Hogan underscores the relationship of the cap on profits to the level of medical services. Director Hogan testified that the Request for Proposal was structured to prevent a sharp reduction in medical care expenditures which had occurred in other states moving into a private system of managed care. (TR. 2–74). According to Hogan, other states have incurred reductions of up to 40% in expenditures. (TR. 2–74). In designing the RFP, the State did not want any reduction in the overall behavioral health care expenditures and did not want an excessive level of profit. (TR. 2–75). Consequently, profits were capped and actually penalties were to be imposed if medical expenditures dropped to under 96% of the monies budgeted for behavioral health care.

The proposal of OBHP undercut both of these important concerns. The $5,364,000 represented less money for care. Further, the bidder would receive that amount of profit only if it controlled and *reduced* expenditures on behavioral health care so as to prevent any need to spend monies set aside in a self-insurance pool. Finally, by sub-

comply with all of the federal law procurement standards governing federal purchases of goods

and services. Consequently, the Court finds that plaintiff's claim under Count IV is withdrawn.

tracting the $5,364,000 in extra administration costs, the total amount available for medical services was reduced dollar for dollar. Consequently, the State's specific goal of spending at least 96% of budgeted medical expenditures was undermined, since the diversion of $5,364,000 to a self insurance fund was exactly a $5,364,000 reduction in funds budgeted for health care services.

The Court also heard the testimony of Richard L. Tully, Jr., Chief of the Office of Fiscal Planning, Ohio Department of Mental Health. Tully was a member of the evaluation team which reviewed all of the proposals submitted in response to the RFP. In a document he prepared, Tully described the bid of OBHP as follows:

OBHP's administrative budget is excessive and its proposed use of pm/pm payments for self-insurance is not in compliance with the RFP requirements. (PX 23, 08328.)

Tully wrote this description as a "Talking Point" to be used in negotiations with OBHP. Tully testified that the talking points were meant to be overstatements used as bargaining points. Tully's written description of the deficiencies in OBHP's proposal are, however, brutally accurate.

The defendants emphasize that the President of OBHP assured state officials during an oral interview that any surplus from the reinsurance fund would not be profit and would be reinvested in medical services. (TR.–148). No such written clarification was ever given to the State by OBHP.

■ The Court finds that the term "bid or offer" as used in 45 C.F.R. § 74.43 refers to a proposal made in the medium or form described in the State's Request for Proposal. Nothing in the RFP permits oral modification as to terms of a proposal regarding a $177,459,000.00 contract. The final proposal to be evaluated must include "all supporting documentation," according to the terms of the RFP itself. Section 8.4. (PX 1, 00082). Further, bidders must submit twelve copies of their proposals. Section 3.3(2) (PX 1, 00026). All terms or conditions must be included in the proposal. Section 3.3(6) (PX 1, 00026). Nowhere in the RFP which consists of two hundred and twenty-three (223)

pages is a bidder authorized to orally modify a proposal.

The Court concludes that the formal bid of OBHP, as properly modified pursuant to its *written* response to the State's Request for Clarification, constitutes the "bid or offer" in "response to the solicitation," as such terms are used in 45 C.F.R. § 74.43. The Court finds that the bid of OBHP was not responsive to the solicitation with respect to a material, critical factor, that being the amount of potential profit.

Title 45 C.F.R. § 74.43 prohibits the award of a procurement contract to a bidder whose offer is not responsive to the solicitation. The defendants have violated 42 U.S.C. § 1396a(a)(4) and 45 C.F.R. § 74.43 by attempting to award the contract to a vendor whose bid or offer was not responsive to the State's solicitation and did not conform to the clear requirements of the RFP.

■ The plaintiff also alleges that the defendants allowed only one bidder, OBHP, to materially change its proposal. Further, the change that OBHP made is alleged to have been only after state employees disclosed to OBHP the precise amount of administrative costs bid by the plaintiff.

The unrefuted evidence of record demonstrates that at approximately 6:00 p.m. on February 3, 1997, Assistant Director of ODMH, Maureen Corcoran, and a number of other state employees, placed a call to the president of OBHP. Corcoran told OBHP's President, Dr. Dozoretz, that the company's administrative costs were too high. Corcoran told Dozoretz that the administrative costs could not exceed $.95 pm/pm, representing the precise amount bid by the plaintiff. The $.95 pm/pm amount for administrative costs also represented a $3,864,000 reduction in the amount previously submitted by OBHP in its proposal.

The next day, OBHP submitted to the state a revised rate schedule which included a total administrative cost equaling $.95 pm/pm. Further, the $.36 pm/pm for "reinsurance," which, as explained by OBHP in its written response to a request for clarification, was actually self-insurance, was deleted. Consequently, the first time that OBHP actu-

ally submitted a proposal in conformity to the State's Request for Proposal occurred only *after* the call placed on February 3, 1997, by Maureen Corcoran.

The defendants argue that the call placed by Corcoran was proper because at that point the state had already selected OBHP. According to the defendants, once the state selected the successful bidder, the competition was over, and the state was free to negotiate the terms of an anticipated contract.

This argument omits the fact that the proposal selected did not conform in a material way to the specifications and requirements of the State's solicitation made to all prospective vendors. The vendor selected by the State did not submit a proposal responsive to the State's solicitation until it was already notified by an earlier phone call from the directors that it was the successful vendor. The disclosure of one bidder's terms to another competitor prior to the selection of a vendor who has submitted a *responsive* proposal is both improper and unlawful.

It is not for this Court to define in all instances the meaning of the term "free and open competition" as used in 45 C.F.R. § 74.43. While again acknowledging the wide latitude and substantial discretion given to the State in the purchasing services, there are limits to such discretion.

In this case, the process was anything but "free and open." The State set up specific requirements to be met by all bidders. Prior to its selection as the successful vendor, OBHP failed to meet a critical element of those requirements. Only after OBHP was selected did it submit a proposal meeting all of the essential requirements of the State's own standards. The final complying bid submitted by OBHP included the precise amount of administrative costs bid by its closest competitor and improperly disclosed by State officials to OBHP.

The Court concludes that the defendants herein violated the requirement of "free and open competition." The Court also finds that the same defendants set forth specific "requirements that the bidder or offeror shall fulfill" and then notified OBHP it had won

the competition without first complying with all such requirements. 45 C.F.R. § 74.43.

## IV.

### *Remedies*

▮▮▮ The plaintiff seeks to enjoin the defendants from entering into a contract with OBHP. An injunction is an equitable remedy. *United States v. Oregon Med. Society,* 343 U.S. 326, 333, 72 S.Ct. 690, 695–96, 96 L.Ed. 978 (1952). The Court is vested with full discretion whether or not to grant requested injunctive relief. *Hecht Co. v. Bowles,* 321 U.S. 321, 329, 64 S.Ct. 587, 591–92, 88 L.Ed. 754 (1944). The Court must apply the principles of equity in assessing each request for injunctive relief. *See* 13 Moore's Federal Practice, § 65.03 (3 Ed.1997).

▮▮▮ Permanent injunctions may be rendered only after a valid adjudication of the merits of the action. To justify a permanent injunction, plaintiff must show actual success on the merits. *Amoco Prod. Co. v. Village of Gambell,* 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 1404 n. 12, 94 L.Ed.2d 542 (1987). The Court determines that plaintiff has succeeded in proving its case on the merits.

The defendants have also urged this Court to consider the harm to Medicaid recipients should a permanent injunction issue. Director Hogan has described the current Medicaid system with regard to behavioral health services as "badly broken." (TR. 2, 66). It is beyond dispute that the State has spent considerable time and money to implement a new type of Medicaid coverage as to behavioral health services involving both a coordination and rationalization of existing services and the implementation of a managed care program. The Court is not insensitive to the State's contention that the current system is in need of reform.

The defendants do not dispute the fact that no person will be denied Medicaid coverage should a permanent injunction issue in this case. Without question, if an injunction issues, the state agencies will be faced with the troublesome task of continuing the existing fee for service Medicaid system currently in place, rather than moving forward on the

planned implementation of a managed care, coordinated system. The agencies will be required to renotify recipients that the anticipated changeover occurring on July 1, 1997, will not occur. The agencies will also have to reverse certain proposed administrative regulations which would facilitate the transition to a coordinated, managed care system.

At the same time, this Court cannot ignore the violations of law as previously set forth. The making of governmental contracts with taxpayers dollars is an area of great public interest. For decades, both the Federal and State governments have enacted laws and regulations to insure that such contracts are entered into in a fair and aboveboard manner. These interests outweigh any administrative inconvenience suffered by the state agencies as a result of the same agencies' failure to comply with the law.

The Court also notes that the issues raised herein do not involve second-guessing of the contracting authority given to the defendants. Had all of the bid proposals been treated in conformity with the law, this Court would readily defer to the expertise of the State defendants. This case involves not a difference of opinion as to which proposal was more advantageous. Rather, the evidence in this case shows a failure to follow lawfully mandated bidding procedures.

The Court will not at this juncture strip the State defendants of their important contracting authority under State law. Therefore, the plaintiff's request that it be awarded the contract, is denied.

The Court does, however, enjoin the defendants from completing the contract with the intervenors and further orders that the defendants may not rely upon the now completed RFP process or any part thereof, to make a future contract with OBHP. While the State defendants may, if they so choose, reissue Requests for Proposals as to the same subject matter, all related procedures with respect to the RFP must be in compliance with the law.

In order to insure such compliance, the Court hereby appoints Attorney Mark Landes as Special Monitor. If the defendants elect to reinstitute a completely new RFP process as the subject matter in the RFP of November 4, 1996, or any part thereof or its equivalent and consider bids or proposals from all interested vendors, they will so inform Attorney Mark Landes and will make available to him all documents necessary for him to insure compliance with this Order. Attorney Mark Landes shall have plenary authority to review any documents, question any officials, and attend any meetings deemed solely by him to be necessary and proper to insure compliance with this Order.

It is therefore **ORDERED, ADJUDGED** and **DECREED** that a Permanent Injunction is hereby issued enjoining the defendants and all persons acting in concert with them from:

1. Entering into a contract with OBHP as to the subject matter, any part thereof, or equivalent, set forth in the Request for Proposals issued by defendants on November 4, 1996;

2. Entering into a contract with OBHP based in whole or in part on the solicitation, evaluation, negotiation or other part of the process following the issuance of the RFP on November 4, 1996.

It is further **ORDERED** that the defendants may, in their discretion, reinstitute proceedings in order to obtain contractual services of the type described in the RFP of November 4, 1996, or any part thereof. While the defendants may, in their discretion, initiate such proceedings and consider proposals from any qualified complying bidder, no contract shall be made by the defendants based upon the proceedings or information derived from the previous bidding process resulting from the issuance of the prior RFP.

It is further **ORDERED** that if the defendants solicit bids or issue a subsequent RFP as to any services described in the RFP of November 4, 1996, or the functional equivalent thereof, it shall promptly notify Attorney Mark Landes and comply with any request made by him in conjunction with his duties as Special Monitor. It is further **ORDERED** that the State defendants shall pay the reasonable and necessary fees and expenses of the Special Monitor.

The United States Marshal for the Southern District of Ohio is authorized and directed to serve a certified copy of this Order upon Christian Fuellgraf, President of the Ohio Controlling Board. The Clerk of Courts shall release the $100,000 bond tendered by the plaintiff. All issues before the Court having been resolved, the Court **DISMISSES** this action. The Court reserves jurisdiction to enforce the terms of this Order.

**IT IS SO ORDERED.**